**UNITED STATES of America**

v.

**Gordon BRODWIN, R.Ph., and Ismael Sosa, R.Ph., Defendants.**

**No. S1 00 CR. 182(JGK).**

United States District Court,
S.D. New York.

Nov. 19, 2003.

---

William C. Silverman, Assist. U.S. Atty., Mary Jo White, U.S. Atty., Criminal Div., New York, NY, for plaintiff.

Raymond R. Granger, Phillips, Lytle et al., New York, NY, Sharon Lee Kegerreis, Hughes, Hubbard & Reed, LLP, Jersey City, NJ, Richard W. Levitt, New York, NY, David H. Weiss, New York, NY, for defendant.

## *OPINION*

KOELTL, District Judge.

The defendants, Gordon Brodwin and Ismael Sosa, were charged with a forty-count superseding indictment on January 25, 2001. The defendants were licensed pharmacists who practiced at Brodwin–Sosa Chemists, Ltd. Count One of the indictment charged the defendants with

conspiring with Ronald A. Jones, M.D., and others known and unknown to distribute and possess with intent to distribute hydromorphone (also known as "Dilaudid"), in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), and 846. Counts Two through Forty charged substantive counts of Dilaudid distribution against Jones and either Brodwin or Sosa, each count based on a prescription that Jones had written and that either Brodwin or Sosa had filled. The superseding indictment also contained a forfeiture allegation. The charges against Jones were severed before trial, and the indictment was redacted so that Jones was not listed as a defendant. On May 25, 2001, following a trial that began on March 7, 2001, the jury returned guilty verdicts against Brodwin and Sosa on all of the criminal counts in the indictment in which each was charged. The Court thereafter declared a mistrial with respect to the forfeiture allegation in the indictment when the Court was unable to reassemble the jury, but the Court entered a forfeiture order on a non-jury basis.

▮ The defendants now move for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure based on newly discovered evidence that Jones was insane at the time of the alleged conspiracy. The defendants have also filed a Notice of Appeal of their criminal convictions. The Court of Appeals for the Second Circuit has entered an order holding the appeal in abeyance while this Court entertains the defendants' motion for a new trial. (*See* Order attached as Ex. C to Defs.' Notice of Joint Mot. ("Notice of Mot.").) While the case is on appeal, this Court retains the jurisdiction to deny a Rule 33 motion, but it may not grant such a motion unless the Court of Appeals first remands the case. *United States v. Camacho*, 302 F.3d 35, 36 (2d Cir.2002) (per curiam). The Court of Appeals has instructed that it will remand the case in such a situation when the district court "signal[s] its intention" to grant a Rule 33 motion. *Id.* at 36–37.

## I.

The facts of the case that are relevant to the current motion are as follows.

### A.

The defendants were arrested on February 16, 2000, pursuant to a complaint charging them with conspiracy to distribute and possess with intent to distribute Dilaudid in violation of federal narcotics laws. (*See* Complaint and Affidavit in Support of the Application for Arrest and Search Warrants attached as Ex. A to Gov't Mem. Opp. Defs.' Joint Mot. for New Trial ("Gov't Mem.").) The affidavit supporting the complaint alleged that Brodwin, Sosa, and Jones had conspired to divert Dilaudid into the illegal drug market by having Jones write, and Brodwin and Sosa fill, numerous prescriptions for Dilaudid that were not supported by a legitimate medical purpose. (*See id.* at 4, 16.) On February 29, 2000, a grand jury returned an indictment charging the defendants in one count with the conspiracy outlined in the complaint. (*See* Indictment attached as Ex. B. to Gov't Mem.)

Following discovery, on November 13, 2000, defendant Jones's counsel sent a letter to the Court and the parties stating that Jones's retained expert psychiatrist, Dr. Robert Berger, would submit a psychiatric evaluation of Jones that would include a finding that Jones was not competent to stand trial. (*See* Letter of Isabelle A. Kirshner dated Nov. 13, 2000 ("Kirshner Ltr.") attached as Ex. F to Gov't Mem.) At a conference held on November 16, 2000 to discuss the issues raised by this letter, Jones's counsel confirmed that Dr. Berger had concluded that Jones was not competent to stand trial, and that Jones

would probably also raise an insanity defense at trial. (Transcript of Conference dated Nov. 16, 2000 ("11/16/00 Tr.") attached as Ex. G to Gov't Mem., at 3.) Trial was at that date already scheduled to begin on December 4, 2000, and the Government requested an adjournment for approximately one month, so that it could conduct its own psychiatric evaluation of Jones with respect to both his competency to stand trial and his sanity at the time of the offense charged. (*Id.* at 4–5.) Counsel for defendants Brodwin and Sosa opposed any adjournment of the trial date and requested that Jones be severed so that the trial of Brodwin and Sosa could proceed. (*Id.* at 6–7.) The Court denied the severance motion at that time based on the interlocking nature of the proof in the case, the advantages to a common trial of all defendants, and the lack of prejudice to any specific trial right of any of the defendants resulting from a joint trial. (*Id.* at 8.) The trial was adjourned to February 5, 2001, and then again to March 5, 2001.

On January 25, 2001, a grand jury returned the superseding indictment against Jones, Brodwin, and Sosa. The superseding indictment added 39 substantive counts of Dilaudid distribution to the original conspiracy count, and each substantive count was based on a specific Dilaudid prescription that Jones issued and that either Brodwin or Sosa filled. (*See* Superseding Indictment attached as Ex. H to Gov't Mem.)

On February 1, 2001, the parties appeared before the Court for another conference. The Court noted that it had received reports from Dr. Berger and from Dr. Stuart Kleinman, the psychiatric expert retained by the Government, and that both reports concluded that Jones was not at that time competent to stand trial. (Transcript of Conference dated Feb. 1, 2001 ("2/1/01 Tr.") attached as Ex. I to Gov't Mem., at 7.) On February 6, 2001,

the Court entered formal findings pursuant to 18 U.S.C. § 4241(d) that Jones was suffering from a mental disease or defect rendering him unable to assist properly in his own defense and thus was not competent to stand trial at that time. Jones was ordered to be committed for hospitalization within the Bureau of Prisons for further testing to determine whether his competency to stand trial might be restored.

At the February 1 conference, the Government requested a thirty-day adjournment of the trial to determine whether Jones would regain his competency such that a trial of all three defendants would be feasible. (2/1/01 Tr. at 24.) Counsel for Brodwin and Sosa objected to any further adjournments and requested that the trial go forward as scheduled on March 5, 2001. (*Id.* at 27.) Also at the February 1 conference, counsel for Jones noted that Dr. Berger and Dr. Kleinman had evaluated Jones only for his competency to stand trial and that further evaluation would be necessary to assess whether Jones might also have a defense of insanity. (*Id.* at 30.) Counsel indicated that she had already asked Dr. Berger to begin his analysis of Jones's sanity at the time of the alleged offenses. (*Id.*)

The Court declined the Government's request to adjourn the trial. The Court noted that a one-month adjournment would likely not be sufficient to resolve the issue of Jones's competency to stand trial, because even if Jones could be stabilized with medication and a government-retained psychiatrist concluded that Jones was competent to stand trial, his defense counsel would then have the right to examine Jones with respect to his competency and his ability to assist in his own defense. (*Id.* at 27–28, 31–32.) The Court noted that the attendant delays would not allow for "a reasonable or fair trial schedule," given Brodwin and Sosa's request for a

speedy trial. (*Id.* at 32.) After the parties declined an invitation to brief the issue further, the Court severed Jones from the trial of Brodwin and Sosa, which was scheduled to proceed on March 5, 2001.

On February 26, 2001, the Government submitted a letter-brief indicating its intent to introduce numerous statements by Jones, pursuant to Federal Rule of Evidence 801(d)(2)(E), as co-conspirator statements. (Gov't Letter to the Court dated Feb. 26, 2001 attached as Ex. B to Notice of Mot., at 1.) The Government's letter stated that the proffered statements would include, among other things:

conversations between Dilaudid traffickers and Dr. Jones concerning Dilaudid prescriptions generally, and in particular where the traffickers should or were required to fill their Dilaudid prescriptions; ... communications between Dr. Jones and other pharmacists regarding his Dilaudid prescriptions and his Dilaudid "patients"; and communications and discussions among co-conspirators, including the defendants and Dr. Jones, regarding the legitimacy or legality of their conduct and the precautions necessitated by the nature of the substance in which they were trafficking.

(*Id.* at 2.) The Government also contended that many of these out-of-court statements by Jones might be admissible on a number of additional bases as well. (*Id.* at 8 n. 3.)

Counsel for Brodwin and Sosa objected to the admission of the statements by Jones, because the Court had already concluded that Jones was not competent to stand trial and because the statements themselves "reflect a bizarre, disjointed thought process." (Letter of Raymond R. Granger to the Court dated Mar. 4, 2001 attached as Ex. J to Gov't Mem., at 2.) At a pretrial hearing on March 7, 2001, the Court concluded, after hearing argument by the parties, that Jones's incompetence to stand trial did not prevent the admis-

sion of his out-of-court statements as co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E). (Transcript of Hearing dated Mar. 7, 2001, at 84.) The statements were admitted subject to a motion to strike at the conclusion of the evidence. (*Id.*) Both at the conclusion of the Government's direct case and at the conclusion of all of the evidence, the Court made specific findings pursuant to *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), that Jones's out-of-court statements were admissible. (Tr. 4098–99, 6031.) Specifically, at the conclusion of all of the evidence, the Court found that "there's more than sufficient evidence to conclude that there was a conspiracy, that the defendants and the declarant were members of the conspiracy, and that the statements were made during the course of and in furtherance of the conspiracy." (Tr. 6031.)

## B.

At trial, the Government presented evidence that described events occurring at two principal and separate locales: (1) the offices of Dr. Jones, and (2) the Brodwin–Sosa Pharmacy owned by the defendants. With respect to the pharmacy, the Government submitted evidence intended to show that the defendants were using their pharmacy as a "Dilaudid dispensing factory." (Tr. 6203.) That evidence included thousands of actual Dilaudid prescriptions filled by the defendants, records that the defendants kept on their pharmacy computer, and the pharmacy's patient profiles and log books. Evidence also included prescription records from other pharmacies in New York City, New York State Medicaid records, and records from the DEA's "Automation of Reports and Consolidated Orders System" ("ARCOS"). There was also evidence from cooperating witnesses who obtained prescriptions from Dr. Jones, filled the prescriptions at the

Brodwin–Sosa Pharmacy, and then diverted the Dilaudid to the illegal drug market.

The evidence from these various sources revealed that between August 1, 1997 and February 15, 2000, the defendants filled approximately 11,000 prescriptions for Dilaudid and dispensed more than 3,000,000 Dilaudid tablets. (*See, e.g.,* Government Exhibit ("GX") 252.) The evidence also revealed that for the years 1997, 1998, and 1999, the Brodwin–Sosa Pharmacy purchased more Dilaudid than any other pharmacy in the United States, and that in 1999 it purchased six times more Dilaudid than the nation's second largest Dilaudid-purchasing pharmacy. (GX 225.) The evidence further showed that about 73 percent of the Dilaudid prescriptions filled by the Brodwin–Sosa Pharmacy-that is, approximately 7,000 prescriptions-were issued by Jones. (GX 251, 252.)

Besides the sheer volume of Jones's Dilaudid prescriptions, the Government submitted other evidence to show that the defendants ignored "red flags" with respect to Jones's prescriptions, as well as those of other doctors. In particular, the Government pointed out the uniformly high number of pills in the prescriptions, the "cookie-cutter" nature of the prescriptions, and the fact that Jones apparently prescribed only Dilaudid to his patients, even though the patients suffered from diseases that would ordinarily require other types of medication. (Tr. 6207.)

The Government also submitted evidence revealing patterns among the Dilaudid prescriptions that the Government argued demonstrated the existence of an illegal diversion scheme. For example, the Government presented examples of "early prescriptions" that showed hundreds of examples of people obtaining Dilaudid from the Brodwin–Sosa Pharmacy in less time than a 30–day supply of the drug would be expected to last. (GX 7047–7509.) Examples of "consecutively

numbered prescriptions" were also submitted to show instances where multiple Dilaudid prescriptions were issued by the same doctor, and then filled by the defendants, in multiple patient names, one after the other. (GX 7510–7546.) The Government submitted prescriptions from "doctor hoppers" as well to show that the defendants filled prescriptions for patients who were getting Dilaudid prescribed by more than one doctor. (GX 7547–7671.) The log books that the defendants maintained at the pharmacy between March 1999 and February 2000 also showed instances of a single person signing for and filling multiple Dilaudid prescriptions in different names-some written by Jones and some by other doctors-sometimes as many as ten or twelve names at one time. (GX 300, 301.) The Government presented evidence that prescriptions issued by Jones were generally paid for in cash. (Tr. 5176.) The defendants also testified that, although their pharmacy did not accept Medicaid and although Medicaid covered Dilaudid, some Medicaid recipients paid cash for Dilaudid at their pharmacy. (Tr. 4296–4300, 4443–48, 5176–88, 5415–17.) There was no evidence that any of the cooperating witnesses ever told Brodwin or Sosa that the witnesses would not use the prescriptions for a legitimate medical purpose. There was evidence, however, that one of the cooperating witnesses used two separate names when filling prescriptions at the pharmacy. (Tr. 1681–82.).

The second principal locale that the evidence described was Jones's offices, which the Government intended to show were being run as a "prescription mill." (Tr. 6222.) The Government's cooperating witnesses, Thomas Canales, Gayle Scudder, and Morris McCoy, testified about their practice of taking multiple individuals posing as sickle cell disease patients to Jones and obtaining Dilaudid prescriptions in

multiple different names. (*See* Tr. 224–26, 1877–80.) The cooperating witnesses testified that Jones rarely required blood tests, and would instead prescribe Dilaudid after he ran the prospective patient through a list of, variously, twenty or one hundred questions, which he asked in rapid succession. (*See* Tr. 203–05, 212, 285, 1790, 1797.) Once the cooperating witnesses took a person to Jones one time, they did not have to bring that person again, because thereafter they could get prescriptions themselves in that person's name from Jones. (*See* Tr. 229–31, 1824–29.) Jones referred to the people who picked up multiple prescriptions in others' names as "helpers." (Tr. 1434, 1829–30.)

Detective Richard Carter, who posed undercover as a patient, was one of several witnesses to testify about what he saw when he went to Jones's office. Carter initially went to Jones's office with a confidential informant, Perry Bouchet, who had previously gotten Dilaudid from Jones. (Tr. 2663.) Carter, using an assumed name, did not have a file with Jones, but Jones added an extra 100 Dilaudid pills to Bouchet's prescription for Carter when he complained of lower back pain. (Tr. 2665–68.) Jones did not conduct any sort of medical examination of Carter before prescribing the Dilaudid. (Tr. 2669.) Carter paid for the prescription using what Jones called the "two-envelope trick," in which the patient would usually give Jones two envelopes, one containing $150 and the other one empty, and Jones would put the prescription in the empty envelope and return it to the patient. (Tr. 2668.) On a subsequent visit to Jones's office, Jones told Detective Carter that Carter had to go to the Brodwin–Sosa Pharmacy in order to get his prescription filled, because if he did not do so, Jones would "deny" having written the prescription and would not provide a refund of Carter's money. (Tr. 2691–93.)

In addition to this statement that Jones made to Carter about going to the Brodwin–Sosa Pharmacy, the Government presented other out-of-court statements by Jones that supported a connection between Jones and the defendants. When Morris McCoy informed Jones that other pharmacies refused to fill his prescription, Jones told McCoy to "go to Brodwin–Sosa on 72nd and there should be no problem." (Tr. 1852.) When McCoy asked whether he would have difficulty filling multiple prescriptions at the Brodwin–Sosa Pharmacy, Jones told McCoy to "let him worry about the pharmacist." (Tr. 1853.) McCoy testified that he took that to mean that Jones "was going to call them and let them know everything was all right." (Tr. 1854.) McCoy testified that Jones said, "Brodwin and Sosa say people was outside selling their pills." (Tr.1921.) When asked if this was "outside their pharmacy," McCoy responded, "yes." (*Id.*) In a recording that Gayle Scudder made of a conversation with Jones, Jones said to her, "remember, without Gordon, you can't do it this way." (Tr. 1448; GX 101RT.) The Government also played another recording in which Jones told Detective Carter: "You guys are going to go to Gordon and do what you have to do." (Tr. 4096; GX 110E.)

The Government argued to the jury, both in its opening statement and its summation, that the conspiracy included Jones and the defendants. In its opening statement, the Government submitted that "Dr. Jones' prescription business depended upon his finding a pharmacy that was willing to dispense Dilaudid like it was water." (Tr. 22.) The Government maintained that the jury would "learn about the arrangement that existed between Dr. Jones and these defendants." (Tr. 26.) In summation, the Government argued that "[t]he conspiracy in this case ... between these defendants and Jones and the diverters is

real simple: Jones writes illegitimate prescriptions, prescriptions that aren't written in the usual course of legitimate medical practice; these defendants fill them; the diverters sell them on the street. Everybody makes money." (Tr. 6219.) The Government relied upon Jones's out-of-court statements to show the membership of the defendants in the same conspiracy with Jones. The Government contended that the understanding between Jones and the defendants could be inferred from "all the comments that Jones makes to the cooperating witnesses about Brodwin–Sosa, how essential they are to the scheme." (Tr. 6224–25.) The Government specifically directed the jury's attention to Jones's statements about Brodwin and Sosa that were made to Scudder and Carter. · (Tr. 6225–26.) Pointing out that Jones directed his patients to the defendants' pharmacy, the Government argued: "Now, nobody does that unless they are committing crimes and they want to keep it in the house. Jones wants to keep the loop together. He wants to keep the triangle from his office over to Brodwin–Sosa to the street. He doesn't want his patients going to other pharmacies." (Tr. 6227.)

In its rebuttal summation, the Government also relied on Jones's out-of-court statements: "Remember what you heard Dr. Jones say on tape. Without Gordon we can't do this like this. You are going to go to Gordon and you are going to do what you have to do. You have to go to my pharmacy, 72nd and First. If you don't go to my pharmacy I will deny writing the prescription." (Tr. 6598.)

The case was submitted to the jury on May 17, 2001. After five and a half days of deliberations, on May 25, 2001, the jury returned verdicts of guilty against both defendants on all the counts with which they were charged.

C.

In November 2001, Jones's competency to stand trial had been restored, and the Court directed Jones's counsel to provide an expert report concerning any mental capacity defense he intended to raise at trial. On April 11, 2002, Dr. Berger presented his report to the Court concerning Jones's mental condition at the time of the offense charged. (Psychiatric–Legal Report, Ronald Jones, M.D., attached as Ex. A to Notice of Mot.) Dr. Berger concluded that Jones suffered from "mental disease, specifically, Bipolar Disorder with psychotic features and Schizotypal Personality Disorder with Narcissistic traits." (*Id.* at 6.) Dr. Berger concluded "with a reasonable degree of medical certainty" that Jones's behavior and conduct were caused by his mental illness "to such a degree that he was unable to appreciate the wrongfulness of his conduct." (*Id.* at 25.)

After receiving Dr. Berger's report, the Government retained Dr. Kleinman to examine Jones with respect to his mental state at the time of the offense. After conducting an evaluation of Jones, Dr. Kleinman concurred with Dr. Berger's conclusion that Jones was insane at the time of the offense charged. The parties appeared for a conference before the Court on November 8, 2002, and the Government advised the Court that, based on the findings of Dr. Berger and Dr. Kleinman, it was of the view that entry of a finding of not guilty by reason of insanity was appropriate with respect to Jones. (Transcript of Conference dated Nov. 8, 2002 attached at Ex. O to Gov't Mem., at 2.) The Court adjourned the case so that, among other things, the parties could consider the appropriate procedure for such a finding and the consequences it might have for Jones. (*Id.* at 22–23.)

The parties thereafter appeared before the Court on March 4, 2003. At that time,

the Government presented the Court with a *nolle prosequi* order, dismissing the charges in the indictment against Jones. (Transcript of Hearing dated Mar. 4, 2003 attached as Ex. P. to Gov't Mem., at 2–3.)

## II.

■ The defendants have now moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure on the grounds that Jones's insanity is newly discovered evidence that, if presented to the jury, would result in their acquittal.[1]

■ Rule 33 states that the court may grant a defendant's motion for a new trial "if the interest of justice so requires." Fed.R.Crim.P. 33(a). Rule 33 "specifically contemplates that such motions may be made based on newly-discovered evidence." *United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir.1992). "Relief is justified under rule 33 if the defendant makes a showing that the evidence is in fact 'new', i.e., it could not have been discovered, exercising due diligence, before or during trial, and that the evidence is so material and non-cumulative that its admission 'would probably lead to an acquittal.'" *Id.* (quoting *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980)). Another way to phrase the inquiry is "whether or not there is in reality a 'significant chance' that the disclosure would have induced reasonable doubt in the minds of enough jurors to prevent a conviction." *United States v. Rosner,* 516 F.2d 269, 273 (2d Cir.1975).

■ A district court "has 'broad discretion' to decide Rule 33 motions based upon its evaluation of the proof produced ... because, having presided over the trial, it is in a better position to decide what effect the newly discovered materials might have had on the jury." *United States v. Gambino,* 59 F.3d 353, 364 (2d

Cir.1995) (citations omitted). Nevertheless, "a district court must exercise 'great caution' in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only *in the most extraordinary circumstances."* *United States v. Spencer,* 4 F.3d 115, 118 (2d Cir.1993) (emphasis in original) (internal quotation marks and citation omitted).

### A.

The Government argues that the defendants' motion for a new trial must be denied on the grounds that the evidence of Jones's insanity is not "new," because it could have been discovered with reasonable diligence by counsel for Brodwin and Sosa. The Government notes that in the months leading up to the trial the defendants were on notice that Jones might be suffering from some mental defect, yet defense counsel never made any application to the Court requesting that Jones be evaluated for his sanity. The Government points out, for example, that in their July 2000 motions for a severance and to exclude the use of Jones's statements at trial, the defendants described Jones's statements as "bordering on the bizarre." (Mem. Support Joint Pretrial Mots. Of Gordon Brodwin and Ismael Sosa attached as Ex. D to Gov't Mem., at 13.) The Government contends that the issue of Jones's sanity was plainly raised to the attention of all the parties by Jones's counsel's November 13, 2000 letter notifying the Court and the parties that Jones intended to rely at trial upon a defense of insanity. The Government contends that it was incumbent upon the defendants' counsel, in the exercise of ordinary diligence, to request that Jones, who at this point had already been evaluated by Dr.

---

1. Although there has not been a formal finding of Jones's insanity at the time of the offense charged in the indictment, the Government conceded in its papers and at argument that the Court must assume Jones's legal insanity for the purposes of this motion.

Berger with respect to his competency to stand trial, be further evaluated to determine his sanity at the time of the offense. Because the defendants failed in their due diligence to pursue such a course of action, the Government contends, the determination that Jones was in fact insane at the time of the offense cannot be considered "new" in the sense required by Rule 33.

The Government relies on *United States v. Slutsky*, 514 F.2d 1222 (2d Cir.1975). In *Slutsky*, the Court of Appeals upheld the district court's denial of a motion for a new trial where the defendants, two hoteliers charged with tax evasion, claimed to have uncovered after trial some financial statements of another enterprise they owned that would provide a defense to the charges. *See id.* at 1224–25. The Court of Appeals concluded that the defendants knew, or should have known, of the existence of "any such exculpatory evidence and its ramifications." *Id.* at 1225. The court noted that the legal implication of the evidence could not have been lost on the defendants, and that if it had been, the specific testimony during the trial "should have been sufficient to raise the appellants' awareness level and to bring home the importance" of the evidence contained in the overlooked financial statements. *See id.* at 1225. The court concluded:

> It is far too late for seasoned businessmen with a thorough knowledge of their operations and access to all pertinent records to claim that they were unable to comprehend the nature of the case against them or to decide what evidence might be helpful to their cause. Had the appellants and their able trial counsel been inclined to present the evidence which is now claimed to be "newly discovered," they clearly had the tools to do so at the time of trial.

*Id.* at 1225.

The issues presented by the newly discovered evidence in this case are different from those in *Slutsky*. The Government contends that the defendants were on notice that Jones had exhibited behavior suggesting that he might have suffered from a mental defect, and that the defendants had the tools at their disposal to determine whether that behavior rose to the level of legal insanity. However, the evidence that is newly discovered in this case is not Jones's bizarre behavior, which the parties were aware of before trial, but rather the conclusions reached by experts for Jones and for the Government that Jones was not sane at the time of the offenses charged. Therefore, although the evidence supporting the experts' conclusions was available before trial, it was not apparent that an expert would conclude that Jones was insane at the time of the offenses charged, and, more importantly, the specific evidence, namely the expert opinions, simply did not exist until after the defendants were convicted. *See United States v. Massa*, 804 F.2d 1020, 1022 (8th Cir.1986) (disagreeing with district court's conclusion that psychiatrist's report about defendant was not "new" evidence because defendant and his family were well aware of his mental history, and concluding that "[a]lthough the factual details underlying [the psychiatrist's report] were known to Massa prior trial, he did not know that an expert would opine that those details of his life had so affected his mental state as to render him incapable of committing the crimes with which he was charged"). In this way, the evidence at issue here differs from that in *Slutsky*, where the Court of Appeals found that both the evidence and its legal ramifications were immediately discoverable, with due diligence, before or during the trial.

The Government nonetheless argues that the defendants should have requested that Jones be evaluated for his sanity at the time of the offenses, and that by neglecting to do so, the defendants failed to

exercise due diligence in discovering Jones's insanity before trial. The defendants cannot be faulted, however, for not pursuing a finding of Jones's legal insanity before trial, because that course of action would have faced formidable obstacles that would have made the outcome of any such request both highly uncertain and the cause of much delay. The Government has cited no authority that would have supported the defendants' efforts to secure a psychological evaluation of a co-defendant, and alleged co-conspirator, who had been severed on the grounds that he was not competent to stand trial. Any such request or application by the defendants would have been subject to either the consent of Jones or an order of this Court, neither of which the defendants should reasonably have expected to be forthcoming, given the fact that Jones himself had rights to a fair trial that deserved protection and that Jones was then hospitalized in an attempt to restore his competency to stand trial. The uncertainty resulting from the formidable obstacles the defendants would have faced in making an application for a psychiatric evaluation of Jones, along with the substantial delays that would have resulted from simply making the application, place the request outside the ordinary diligence that could be expected of the defendants in putting on their defense.

The cases cited by the Government do not support a contrary conclusion. In *United States v. Zagari*, 111 F.3d 307 (2d Cir.1997), the Court of Appeals affirmed a district court's denial of a motion for a new trial that was based on the defendants' claim that they had discovered new evidence that a Government witness was insane, including clinical diagnoses that he was a pathological liar and suffered from multiple personality disorder. *See id.* at 318–19. The court concluded that the defendants had actual knowledge of other witnesses who had information about the witness's alleged insanity, and thus found that the defendants could have found the evidence before or during trial in the exercise of due diligence. *See id.* at 320. The court also found that the evidence was only cumulative impeachment evidence against a witness and that there was other independent evidence of guilt. *Id.* at 322.

The same conclusion does not apply here. The evidence at issue in *Zagari* was impeachment evidence, evidence of the government witness's bizarre statements and clinical diagnoses of psychological problems that would aid the defendants in casting doubt on the witness's credibility. The Court of Appeals determined that the evidence needed to impeach the witness was discoverable before trial. *Zagari* differs from this case because there was evidence that existed before the trial-such as statements by the witness's psychologist-that could have been discovered before the trial. Moreover, the evidence that the defendants in this case assert is "new"-the conclusions of opposing experts that Jones was insane at the time of the offenses charged-goes to more than mere impeachment, because it would require a substantial change in the evidence submitted at trial as well as in the Government's theory of prosecution.

In *United States v. Allen*, 554 F.2d 398 (10th Cir.1977), another case cited by the Government, the Court of Appeals for the Tenth Circuit affirmed the denial of a motion for a new trial that was based on defense counsel's discovery after trial of evidence indicating that the defendant was insane at the time of the offense charged. The court concluded that both the defendant, who had been found competent to stand trial, *id.* at 401 n. 2, and his defense counsel were sufficiently aware of the defendant's mental history, including the defendant's prior hospitalization and electroshock therapy treatment, such that the

failure to secure an expert's finding that the defendant was legally insane was a failure of due diligence. *See id.* at 403–04; *but see Massa,* 804 F.2d at 1022.

The conclusion reached by the court in *Allen* does not apply here, where, as explained above, it would have required more than ordinary diligence for the defendants to pursue a finding of legal insanity of a co-defendant. Unlike the defendant in *Allen,* the defendants here did not have, peculiarly within their own knowledge and control, either the information or the authority required for an expert finding regarding Jones's insanity at the time of the offense.

Therefore, the evidence of Jones's insanity is "newly discovered evidence," which, if the other requirements of Rule 33 are also met, would require a new trial.

### B.

The next issue is whether the evidence of Jones's insanity is material and non-cumulative and would probably result in the acquittal of the defendants. This is not a situation where the new evidence discovered after trial would merely be another factor in the jury's calculus. Rather, the evidence of Jones's insanity would have substantially changed the defendants' trial, because it would very likely require the exclusion of important evidence admitted at trial and because it would require the Government to change the theory of prosecution it presented to the jury. The Government argued from the beginning of the case that this case involved a triangular conspiracy involving Jones, the defendants, and the diverters. If Jones was legally incapable of being a member of a conspiracy as a result of his mental state, then this argument would not have been available to the Government. Moreover, the out-of-court statements which were admitted only as co-conspirator statements should not have been admitted. These statements were particularly damaging to the defendants, to the extent that they showed that Jones was working with the defendants and that Jones considered the Brodwin–Sosa Pharmacy to have been, in the Government's characterization, "my pharmacy." (Tr. 6598.) The evidence of Jones's insanity is therefore both material and non-cumulative, but it must be determined whether, for each count on which the defendants were convicted, it would probably have led to an acquittal.

#### 1.

With respect to Count One, the Court instructed the jury that the indictment "charges that it was an object of the conspiracy that Gordon Brodwin, R.Ph., and Ismael Sosa, R.Ph., the defendants, Ronald Jones, M.D., and others known and unknown would and did distribute hydromorphone in violation of the federal narcotics laws." (Tr. 6656.) The Court further instructed the jury that "[t]he object of the conspiracy charged thus includes two separate illegal objectives of the conspiracy":

First, that the defendants as pharmacists would and did distribute a controlled substance in violation of the federal narcotics laws, and second, that Dr. Jones, a physician, would and did distribute a controlled substance in violation of the federal narcotics laws. An agreement to accomplish either one of these objectives is sufficient. If the government fails to prove at least one of the objectives was an objective of the conspiracy in which the defendants participated, then you must find the defendants not guilty of the conspiracy count. However, if you find that any defendant agreed with another person to accomplish either of the objectives charged in the indictment, then you may find the defendant guilty of conspiracy if you find the other elements of the crime satisfied. However, you must all agree

on the specific object the defendant you are considering agreed to accomplish. (Tr. 6656–57.)

The parties now dispute whether, given Jones's insanity at the time of the offense charged, the second objective is legally possible. The defendants contend that it would have been contrary to law for the jury to have found a conspiracy whose objective was for Jones to act in violation of the federal narcotics laws, because Jones's mental state prevented him from having the requisite mens rea.[2] With respect to the second objective, the Court charged the jury that the government would have to prove all of the elements of the conduct the conspirators agreed upon, which included "[t]hat the doctor would distribute the controlled substance unlawfully, knowingly and intentionally, in other words, that he would purposely and deliberately distribute a controlled substance knowing that it was being prescribed or was going to be used other than for a legitimate medical purpose and not in the usual course of medical practice." (Tr. 6658.) The defendants contend that such purposeful conduct by Jones was legally impossible and thus could not have been the objective of an unlawful conspiracy. The Government, however, argues that the second objective did not require that Jones be criminally culpable or that he have the legal capacity to enter a conspiracy. Specifically, the Government contends that the defendants could have conspired with each other or with the Dilaudid diverters, with the objective that Jones would issue Dilaudid in violation of the narcotics laws.

In order to decide this motion, it is not necessary to determine whether the second objective fails as a matter of law, because the evidence of Jones's insanity likely would have raised reasonable doubt in the minds of the jurors with respect to both objectives of the conspiracy. If the jury had been aware of the evidence indicating Jones's insanity, it is highly unlikely that they would have convicted the defendants for a conspiracy whose object was for Jones purposefully and deliberately to distribute Dilaudid knowing that it was being prescribed or that it was going to be used other than for a legitimate medical purpose. If the jury determined that this was the objective of the conspiracy, then the new evidence would likely result in an acquittal.

The new evidence would also likely result in an acquittal if the jury had concluded that the first objective was the objective of the conspiracy. The Government tried this case throughout on the basis that there was a three-way conspiracy among Jones, the defendants, and the diverters. Nonetheless, the Government contends that even without the evidence of a conspiracy involving Jones, the jury still could have convicted the defendants. The Government points to the circumstantial evidence it presented regarding what the defendants were aware of within their own pharmacy, including the volume of pre-

---

**2.** The defendants argue that if the second objective is legally invalid then the defendants cannot be convicted of the conspiracy count, because it is impossible to know whether the jury convicted the defendants based upon that objective. *See United States v. Foley*, 73 F.3d 484, 493 (2d Cir.1996) ("When ... the jury has been presented with several bases for conviction, one of which is invalid as a matter of law, and it is impossible to tell which ground the jury selected, the conviction must be vacated. Though the mere insufficiency of the evidence to support one of the bases submitted to the jury does not fall within this principle, a basis is invalid as a matter of law when the conduct in question fails to come within the statutory definition of the crime." (internal quotation marks and citations omitted)); *United States v. Zvi*, 168 F.3d 49, 55 (2d Cir.1999) ("Defendants are correct that a conspiracy conviction must be reversed where one or more objects is invalid and 'it is impossible to tell which ground the jury selected.' " (quoting *Foley*, 73 F.3d at 493)).

scriptions and other "red flags" with respect to the way the prescriptions were being written and filled. But the Court cannot conclude that this evidence, as it was presented in this case, would have resulted in convictions. Indeed, it is probable that this evidence alone, together with evidence that Jones was insane, would have left reasonable doubt in the minds of the jurors.

This is true for several reasons. A substantial amount of evidence was introduced at trial to show that Jones was knowingly issuing prescriptions for Dilaudid other than for legitimate medical purposes. His practice was portrayed as a "prescription mill" where he did not require blood tests for the prescriptions and where he gave numerous prescriptions for cash to the "helpers." In its summations, the Government referred repeatedly to Jones's criminal intent. (*See, e.g.,* Tr. 6595 (". . . [Y]ou know that Dr. Jones was a fraud and a sham. He was a quack who was operating an illegitimate prescriptions mill and it was an illegitimate prescriptions mill that was fueling these defendants' business.").) The defendants were allegedly linked to Jones's practice, which was portrayed as not simply mindless, but rather intentionally unlawful. This is significant for both objects of the conspiracy because it reinforced the Government's argument repeatedly made in summation, that the defendants' operation was inextricably intertwined with Jones's business. (*See, e.g.,* Tr. at 6226 ("Jones knows exactly what's going on and you know that at least Jones believes that these defendants are in on it. . . . So you know that Jones is directing people to Brodwin–Sosa because he knows that Brodwin–Sosa is a sure thing for his prescriptions. Now, nobody does that unless they are committing crimes and they want to keep it in the house. Jones wants to keep the loop together. He wants to keep the triangle from his office over to Brodwin–Sosa to the street.").)

These arguments, and the evidence of Jones's supposed criminal intent, could not exist if the evidence of Jones's insanity were introduced. Moreover, some of the most damaging out-of-court statements by Jones could not have been introduced as co-conspirator statements. What Jones said in the course of writing prescriptions may well have been admissible as statements that were not hearsay because they were not being offered for the truth of the statements. *See* Fed.R.Evid. 801(c). However, several of the most damaging statements would likely be excluded because they were statements being offered for the truth and were admissible only as co-conspirator statements. These would include Jones's statements that he would call the pharmacists and tell them it was all right, that there would be no problem if McCoy went to the Brodwin–Sosa Pharmacy, and that Brodwin and Sosa say people were outside the pharmacy selling their pills. (Tr. 1852, 1854, 1921.)

This is not to say that some presentation of the circumstantial evidence, under a different theory of prosecution, could not result in a conviction of the defendants. Indeed, defense counsel conceded at the argument of the motion that the grand jury could return a superseding indictment without Jones as a co-conspirator. But the Court must consider how that evidence was presented in this trial, and not how it might be presented in some other trial. And in this case, that circumstantial evidence was marshaled alongside and supported by the evidence of a conspiracy with Jones. Even with the evidence of the purported criminality of Jones, and the out-of-court statements linking Jones with Brodwin and Sosa, the jury found this a close case, as reflected by their five and a half days of deliberations before returning their verdict. Standing alone, in this trial,

the circumstantial evidence would probably not have been sufficient, and thus the new evidence would probably result in an acquittal.

2.

The same conclusion is required on the substantive counts. The Court instructed the jury that the Government must prove "beyond a reasonable doubt that the defendant you are considering purposefully and deliberately distributed a controlled substance knowing that it had been prescribed or was going to be used not in the usual course of legitimate medical practice and that the defendant you are considering was not acting out of mistake or carelessness." (Tr. 6644.) The Government contends that there was sufficient evidence to satisfy the elements of the offense, even without any of Jones's out-of-court statements referring to the defendants. The Government points again to the evidence revealing what the defendants were aware of in their own pharmacy, evidence contained in the pharmacy's prescription records, computer records, patient profiles, and log books, among other things. The Government maintains that all of this evidence established for the jury that the defendants knew, or consciously avoided knowing, that the prescriptions they filled had not been prescribed or were not going to be used in the usual course of medical practice.

However, as explained above, the evidence that the Government now claims could support the convictions on the substantive counts did not stand on its own at trial. That evidence was always intertwined with the Government's contention that Jones and the defendants had unlawfully conspired to divert Dilaudid to the illegal drug market. The Government now maintains that the evidence would support a theory of prosecution other than the one it emphasized to the jury. But at trial the jury was continually reminded that the defendants' knowledge of the unlawfulness of the prescriptions they filled could be inferred from their alleged agreement with Jones. Without evidence of that agreement, the Government would have to prove the defendants' knowledge based solely on other evidence. Moreover, that other evidence would not include some of the more damaging statements by Jones. On the basis of the evidence as it was submitted at trial, given the closeness of all the evidence for the jury, and given the Government's reliance in its summations on theories and evidence that could not survive evidence of Jones's insanity, it is plain that if the jury had known that Jones was insane and therefore could not be a member of a conspiracy with the defendants, there would very likely have been reasonable doubt raised in the minds of the jury. For this reason, the newly discovered evidence of Jones's insanity, would probably have resulted in an acquittal on the substantive counts.

CONCLUSION

For all the reasons explained above, the Court would be inclined to grant the defendants' motion for a new trial.