******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# RASHAD MOON *v.* COMMISSIONER OF CORRECTION
## (AC 46198)

Elgo, Suarez and Keller, Js.

*Syllabus*

The petitioner sought a writ of habeas corpus, claiming that he was actually
innocent of the crimes of which he had been convicted. The petitioner
had planned to steal property from the victim with two other individuals,
M and T, although T ultimately did not participate in the robbery. During
the commission of the robbery by the petitioner and M, M shot and
killed the victim. After a jury trial, the petitioner was convicted of felony
murder, robbery in the first degree, and conspiracy to commit robbery
in the first degree. In a subsequent trial, M was found not guilty by
reason of mental disease or defect of the crimes with which he was
charged stemming from the robbery. In his habeas petition, the petitioner
claimed that, as a matter of law, he could not have conspired with M
or formed an agreement with him to participate in a robbery of the
victim because M lacked the mental capacity to engage in the charged
crimes. The habeas court denied the petition for a writ of habeas corpus
and subsequently denied the petition for certification to appeal. On the
petitioner's appeal to this court, *held*:

1. The habeas court abused its discretion in denying the petition for certifica-
tion to appeal; the petitioner's actual innocence claim involved issues
that were debatable among jurists of reason, that could have been
resolved by a court in a different manner, and that raised a question
that was adequate to deserve encouragement to proceed further.

2. Even assuming, as this court did, that the fact of M's incapacity was
newly discovered evidence, which was essential for the petitioner's
claim regarding actual innocence, the petitioner could not prevail on
his claim that the habeas court improperly concluded that he failed to
prove that he was actually innocent of the crimes of which he was
convicted:

a. The petitioner failed to meet his burden of proving his actual innocence
with regard to his conviction of conspiracy to commit robbery in the
first degree: although there was no question that M was unable to form
any intent to conspire with the petitioner to rob the victim and that,
therefore, no crime of conspiracy could have been committed with M,
the aggregate evidence at the petitioner's criminal trial and his habeas
trial, all of which was required to be considered by the habeas court,
would not prevent a reasonable jury from finding, beyond a reasonable
doubt, that the petitioner was guilty of conspiring with T to commit
the robbery, and, as such, even if evidence of M's incapacity had been

presented at the petitioner's criminal trial, there was still sufficient evidence from which the jury could have found the petitioner guilty of conspiracy to commit robbery.

b. The petitioner could not prevail on his claim that he was actually innocent of robbery in the first degree and felony murder because M's mental state prevented him from forming any intent to participate in the robbery, which was the predicate felony for the felony murder charge: because the plain language of the statute governing first degree robbery (§ 53a-134 (a) (2)) provides that an individual may be guilty of first degree robbery if he or another participant in the crime uses or threatens the use of a deadly weapon, there was sufficient evidence for the jury to find that, during the commission of the robbery, the petitioner acted in concert with M; moreover, because the petitioner never disputed that M shot and killed the victim, the petitioner's criminal liability as an accessory for acts perpetrated by M was inherent in § 53a-134 (a) (2), and the fact that M lacked the ability to form any criminal intent due to his mental disease or defect did not excuse the petitioner from liability; furthermore, the felony murder statute (§ 53a-54c) does not require proof of intent and, because the petitioner was criminally liable as a participant in the robbery and the homicide was committed by the other participant, M, in the execution of that robbery, he was also guilty of felony murder pursuant to § 53a-54c.

Argued February 7—officially released September 10, 2024

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Newson, J.*; judgment denying the petition; thereafter, the court, *Newson, J.*, denied the petition for certification to appeal, and the petitioner appealed to this court. *Affirmed.*

*Naomi T. Fetterman*, assigned counsel, for the appellant (petitioner).

*Linda F. Rubertone*, senior assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Angela R. Macchiarulo*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

KELLER, J. The petitioner, Rashad Moon, appeals, following the denial of his petition for certification to

appeal, from the judgment of the habeas court denying his second amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court improperly (1) denied his petition for certification to appeal, and (2) rejected his actual innocence claim. We conclude that the habeas court abused its discretion in denying the petition for certification to appeal, but we agree with its determination that the petitioner failed to meet his burden of proving actual innocence. Accordingly, we affirm the judgment of the habeas court denying the petitioner's habeas petition.

The following facts, as set forth by this court in the petitioner's direct appeal from his conviction, and further supplemented by the record and procedural history in the habeas proceeding, are relevant to the resolution of this appeal. "In May, 2013, the victim, Felix DeJesus, and his fiancée posted two T-Mobile Springboard tablets for sale on Craigslist. The Craigslist posting stated that the tablets were being sold for $300 each or $500 for both of them and included the victim's phone number. On May 8, 2013, at approximately 7 p.m., a prospective buyer of the tablets called the victim. The prospective buyer said that he did not have a car and asked the victim to meet him in Hartford so that he could purchase the tablets. The victim agreed to travel to Hartford and, shortly after 7 p.m., the victim left his home in Cromwell with the tablets.

"At approximately 7:45 p.m., a resident of the neighborhood where the crime occurred, Gloria Therrien, observed the victim park his car in front of 16 Allendale Road. From inside her home, Therrien saw two men approach the car and stand at its driver's side window. One of the men spoke to the victim through the front driver's side window while the other man stood next to him. Therrien heard a gunshot and saw the two men run away from the car, using a cut through that connected Allendale Road to Catherine Street. Therrien

then went outside and walked toward the victim's car. She observed that the car windows were open and that the victim was in the driver's seat of the car 'jerking . . . and gurgling.' Therrien asked some children who were nearby to call 911 and report that someone had been shot.

"The police arrived at the scene at approximately 8 p.m. When Jeffrey Moody, an officer with the Hartford Police Department (department), arrived, he saw the victim's car and noticed that its engine was running and that the victim was inside. Moody approached the car and found the victim unresponsive. Thereafter, emergency services took the victim to Hartford Hospital, where he died of a single gunshot wound to the head at approximately 3:46 a.m.

"Chris Reeder, a detective with the department, arrived at the scene at approximately 8:30 p.m., after the victim had been taken to Hartford Hospital. Reeder searched the interior of the victim's car and found a T-Mobile Springboard Tablet and a white Samsung cell phone. The police took possession of both items.

"On May 9, 2013, the police extracted data from the cell phone, which they determined had belonged to the victim. The data extracted from the cell phone included a series of text messages and phone calls between the victim and a cell phone number that belonged to Marvin Mathis, an individual who resided near the scene of the crime. Around the time of the murder, there were text messages between Mathis and the victim . . . which . . . instructed the victim to meet him at 16 Allendale Road.

"That same day, Reeder went to speak with Mathis at his home on Allendale Road. Mathis denied having any knowledge of the shooting and stated that he was asleep at home when the crime occurred. Mathis also

stated that he was with the [petitioner] from approximately 6 to 7:30 p.m. on the night of the shooting and that while they were together, the [petitioner] borrowed his phone.

"Mathis allowed Reeder to view his cell phone and the text messages on the device. The text messages on Mathis' cell phone matched the text messages that the police had extracted from the victim's cell phone. Mathis, however, denied sending the messages and stated that the [petitioner] must have sent them. Reeder also observed that the call log on Mathis' cell phone revealed that, at approximately the time of the shooting, there were calls between Mathis and the [petitioner]. On May 8, 2013, there were calls between the [petitioner] and Mathis at 6:02, 7:51, 7:52 and 9:53 p.m.

"On May 12, 2013, Reeder spoke with the [petitioner] and the [petitioner's] girlfriend, Brittany Hegwood. Hegwood informed the police that on the night of the shooting, she witnessed Mathis and the [petitioner] walk 'down Catherine Street toward Hillside [Avenue]' together and that when the [petitioner] returned approximately five minutes later he stated '[Mathis] just shot somebody.'

"The [petitioner] also provided the police with a statement in which he admitted that he was with Mathis on the night of the shooting and that he went with Mathis to meet the victim. The [petitioner] stated that Mathis told the [petitioner] that he was going to buy 'some stuff' from the victim. The [petitioner] further stated that he stood approximately thirty feet away from the victim's car while Mathis spoke with the victim through the driver's side window. The [petitioner] stated that he looked away from Mathis and heard a gunshot, at which point he and Mathis ran away from the car to the [petitioner's] house on Catherine Street.

"As part of their investigation, the police obtained a search warrant for the [petitioner's] cell phone records. The [petitioner's] cell phone records revealed calls between the [petitioner] and a phone number belonging to an individual by the name of Jahvon Thompson on May 10 and 14, 2013.[1]

"On May 23, 2014, approximately one year after the shooting, Thompson, who was under arrest at the time, spoke with Reeder. Thompson informed Reeder that he and the [petitioner] initially had planned to rob the victim because they 'were broke.' Thompson further stated that 'a day or two' before the crime he, the [petitioner], and Mathis were together and that the [petitioner] was texting the victim on Mathis' phone. Thompson stated that ultimately he did not participate in the robbery because 'something came up.'

"Additionally, in May of 2014, an individual by the name of Tyrell Hightower left three messages on a police tip line, in which he indicated that he had information about a homicide that had occurred on Allendale Road one year earlier. On June 2, 2014, Reeder met with Hightower at Hartford Correctional Center, where Hightower was incarcerated. During the meeting, Hightower informed Reeder that the [petitioner] had confessed to him that he and Mathis were involved in the murder of the victim. Hightower further stated that the [petitioner] had informed him that it was a 'robbery that went bad' and that Mathis had shot the victim.

---

[1] The petitioner submitted the transcripts from his four day criminal trial as exhibits at the habeas trial. Our review of Reeder's testimony in the criminal trial reveals that on Friday, May 3, 2013, Mathis' cell phone was used to call Thompson's cell phone. As this court noted in deciding the petitioner's direct appeal, and as we discuss further in part II C of this opinion, Thompson gave a statement to the police in which he indicated that he, the petitioner and Mathis were together, planning the robbery, " 'a day or two' " before the victim was killed. *State* v. *Moon*, 192 Conn. App. 68, 73–74, 217 A.3d 668 (2019), cert. denied, 334 Conn. 918, 222 A.3d 513 (2020).

"In late June of 2014, the police arrested the [petitioner]. After a jury trial, the [petitioner] was convicted of felony murder,[2] robbery in the first degree,[3] and conspiracy to commit robbery in the first degree.[4] The court sentenced the defendant to a total effective sentence of forty-nine years of incarceration." (Footnotes added.) *State* v. *Moon*, 192 Conn. App. 68, 71–74, 217 A.3d 668 (2019), cert. denied, 334 Conn. 918, 222 A.3d 513 (2020).

The petitioner then appealed from his judgment of conviction to our Supreme Court, which transferred the appeal to this court. In his direct appeal, the petitioner claimed that the trial court improperly (1) instructed the jury on accomplice liability, (2) failed to poll the jurors on his affirmative defense, (3) admitted into evidence two spent shell casings that were unconnected to the crime, and (4) instructed the jury on conspiracy to commit robbery in the first degree without instructing it on the intent required for robbery in the first degree. Id., 70–71. We affirmed the judgment of the trial court; id., 101; concluding that, in a supplemental instruction, the trial court did not introduce a new theory of liability when it added the phrase "another participant" to the instructions on the use of physical force element of

[2] General Statutes § 53a-54c provides in relevant part: "A person is guilty of [felony] murder when, acting either alone or with one or more persons, such person commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, such person, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[3] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ." See also *State* v. *Moon*, 192 Conn. App. 68, 77 and n.3, 217 A.3d 668 (2019), cert. denied, 334 Conn. 918, 222 A.3d 513 (2020).

[4] General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

robbery in the first degree. Id., 79–80. We further held that the court did not improperly (1) fail to poll the jury on the petitioner's affirmative defense to felony murder; id., 84; (2) admit into evidence two spent shell casings that were unconnected to the shooting because the casings were relevant to prove that the defendant had the means to commit the crime; id., 94; and (3) omit from its instruction on conspiracy to commit robbery in the first degree an instruction on the element of intent. Id., 101. The petitioner unsuccessfully petitioned our Supreme Court for certification to appeal. See *State* v. *Moon*, 334 Conn. 918, 222 A.3d 513 (2020).

The petitioner, as a self-represented party, filed a petition for a writ of habeas corpus on or about March 29, 2018. He subsequently was appointed counsel and, on or about October 31, 2022, filed a second amended petition, the operative petition, wherein he alleged, in two counts, that his criminal trial counsel was ineffective and that he was actually innocent of all three crimes on the basis of newly discovered evidence. The habeas court, *Newson, J.*, held a trial on November 7, 2022. On November 25, 2022, the habeas court issued its decision denying both counts of the petition.

During the habeas trial, the petitioner attempted to prove that he was actually innocent of conspiracy to commit robbery in the first degree and robbery in the first degree because Mathis could not form the intent to conspire to commit robbery or agree to participate in one with the petitioner. Building on that, the petitioner argued that, because Mathis was not capable of agreeing with him to participate in a robbery, the petitioner also was actually innocent of felony murder because the underlying facts and the predicate felony necessary to support the felony murder charge were negated.

The petitioner presented the testimony of his criminal trial counsel, Attorney Kevin Smith. Smith acknowledged that he was aware at the time of the petitioner's

criminal trial that Mathis, who also had been arrested in relation to these crimes and was awaiting his own trial, intended to raise a defense of "diminished capacity."[5] Smith testified, however, that he did not know that Mathis' case would end, as it did, with a verdict of not guilty by reason of mental disease or defect. See General Statutes § 53a-13.[6] The petitioner also submitted as exhibits at the habeas trial the transcripts from the Mathis trial and his own criminal trial.[7]

In denying the petitioner's claim of actual innocence, the habeas court rejected the petitioner's argument that, as a matter of law, he could not have conspired with Mathis or formed an agreement with him to participate in a robbery of the victim because Mathis had been diagnosed with schizophrenia prior to the homicide and, therefore, lacked the mental capacity to engage in the charged crimes. The habeas court determined that, because the petitioner and Mathis had been tried separately, "the factual findings from Mathis' case cannot simply be inserted into the petitioner's trial." After quoting from our Supreme Court's decision in *State* v. *Colon*, 257 Conn. 587, 602–603, 778 A.2d 875 (2001), which held that there is no requirement for consistency of verdicts

---

[5] The petitioner presented undisputed evidence that Mathis had been charged with robbery in the first degree in violation of § 53a-134, conspiracy to commit robbery in the first degree in violation of § 53a-48, and manslaughter in the first degree in violation of General Statutes § 53a-55. He was tried separately in a two day bench trial on May 24 and 25, 2017, and was found not guilty by reason of mental disease or defect.

[6] General Statutes § 53a-13 provides in relevant part: "(a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. . . ."

[7] We note the absence in the record of the habeas trial of any copies of the actual exhibits introduced during the criminal trials of the petitioner and Mathis. The habeas court was provided only with the petitioner's judgment mittimus, the information and disposition from the Mathis criminal trial and the transcripts of the two trials.

where alleged conspirators are tried separately, the habeas court concluded that "the verdict in Mathis' case does not meet the burden that the petitioner must establish 'by clear and convincing evidence' that he '*could not* have committed the crime, that a *third party* committed the crime, or that *no* crime actually occurred.'" (Emphasis in original.) It explained that "Mathis' verdict only establishes that *if* evidence related to Mathis' mental state [was] presented during the petitioner's criminal trial, the jury *could have* come to a different result, *if* it accepted that evidence." (Emphasis in original.) Moreover, the court stated that "Mathis' verdict does not remove the [petitioner] from the scene of the crime, it does not negate the incriminating statements provided against him by several people, and it does not negate the incriminating text messages connecting him to the victim."

Following the denial of the petition for a writ of habeas corpus, the petitioner filed a petition for certification to appeal, which the habeas court denied on or about December 6, 2022. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the petitioner claims that the habeas court (1) abused its discretion in denying his petition for certification to appeal and (2) improperly rejected his actual innocence claim.[8] As to his actual innocence claim, the petitioner maintains that because his codefendant, Mathis, was found not guilty by reason of mental disease or defect in his subsequent trial, he necessarily lacked the requisite mens rea to enter into a

---

[8] The petitioner's claim on appeal is limited to the habeas court's resolution of count two of the habeas petition in which he alleged actual innocence. The petitioner does not challenge the habeas court's rejection of his ineffective assistance of counsel claim and, thus, it is unnecessary for us to discuss or analyze the court's analysis with respect to that count of the second amended petition.

conspiracy with the petitioner, and that his inability to form an intent to commit any crime at the time disproves each of the three crimes of which the petitioner was convicted: felony murder, conspiracy to commit robbery in the first degree and robbery in the first degree. He argues that the habeas court improperly relied on the rule in *Colon* to reject this claim.

The respondent, the Commissioner of Correction, argues that the habeas court did not abuse its discretion in denying certification to appeal and further argues that the petitioner's contention that the state could not satisfy the element of intent as to the three crimes of which the petitioner was convicted due to Mathis' subsequent acquittal ignores the substantial body of evidence adduced at the criminal and habeas trials. The respondent maintains that the petitioner's actual innocence claim is unavailing because he failed (1) to establish that no reasonable fact finder would have found him guilty based on the evidence presented at his criminal and habeas trials and the reasonable inferences drawn therefrom, and (2) to produce affirmative proof that he did not commit the crimes of which he stands convicted. Although we agree with the petitioner that the habeas court abused its discretion in denying certification to appeal, we agree with the respondent that the habeas court properly found that the petitioner failed to meet his burden of proving actual innocence.

I

DENIAL OF CERTIFICATION TO APPEAL

We first address the petitioner's claim that the habeas court improperly denied the petition for certification to appeal. We agree with the petitioner.

"Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of

discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and the applicable legal principles." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 564, 941 A.2d 248 (2008), quoting *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994).

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by this court for determining the propriety of the habeas court's denial of the petition for certification. Absent such a showing by the petitioner, the judgment of the habeas court must be affirmed." *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 449, 936 A.2d 611 (2007). As our discussion in part II of this opinion reflects, the petitioner's actual innocence claim involves issues that are debatable among jurists of reason, that could have been resolved by a court in a different manner, and the question raised was adequate to deserve encouragement to proceed further. As such, we conclude that the habeas court abused its discretion in denying the petition for certification to appeal. See *Williams* v. *Commissioner of Correction*, 221 Conn. App. 294, 303, 301 A.3d 1136 (2023); *Doan* v. *Commissioner of Correction*, 193 Conn.

App. 263, 272–73, 219 A.3d 462, cert. denied, 333 Conn. 944, 219 A.3d 374 (2019).

## II

## ACTUAL INNOCENCE

Next, we address the petitioner's claim that the habeas court improperly concluded that he failed to prove that he is actually innocent of conspiracy to commit robbery in the first degree, robbery in the first degree and felony murder. We do not agree.

In support of his claim of actual innocence, the petitioner presented evidence to support his theory that the determination in a subsequent criminal proceeding that his codefendant, Mathis, was not legally capable of forming the criminal intent necessary to be held responsible for his crimes constituted newly discovered evidence of the petitioner's innocence. In its memorandum of decision, the habeas court aptly described the petitioner's claim as follows: "The petitioner did offer the theory that [he] could not, as a matter of law, have formed a criminal agreement with codefendant Mathis because Mathis did not have the mental capacity to form a criminal conspiracy. It is undisputed that Mathis, who was charged similarly to the petitioner, was found not guilty on May [25], 2017, after successfully presenting the affirmative defense commonly referred to as not guilty by reason of insanity . . . . Mathis was tried separately after the petitioner.

\* \* \*

"More specifically, the petitioner argues that the codefendant's lack of mental capacity would have negated the element of robbery in the first degree requiring the state to prove that another participant in the crime was armed with a deadly weapon, the theory being that Mathis could not have formed the criminal intent to be a participant in the robbery. On that same

basis, the petitioner argues that Mathis did not have the legal capacity to enter into a criminal conspiracy, negating an essential element of the conspiracy to commit robbery in the first degree charge. Finally, follows the petitioner, a determination that Mathis was not capable of appreciating the criminal nature of the criminal conduct he engaged in with the petitioner would effectively negate, as charged, the underlying facts and the supporting felony necessary to support the felony murder charge." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.)

At the outset, we set forth the legal principles relevant to our resolution of this claim and our standard of review. To secure habeas corpus relief in the form of a new trial based on a claim of actual innocence, the petitioner must satisfy the two criteria set forth in *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 747, 700 A.2d 1108 (1997). Specifically, "the petitioner [first] must establish by clear and convincing evidence that, *taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—*he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish that, *after considering all of that evidence and the inferences drawn therefrom* . . . no reasonable fact finder would find the petitioner guilty of the crime." (Emphasis added.) Id. With respect to the first criterion, "[t]he appropriate scope of [our] review is whether, after an independent and scrupulous examination of the entire record, we are convinced that the finding of the habeas court that the petitioner is [or is not] actually innocent is supported by substantial evidence." Id., 803. With respect to the second criterion, our scope of review is plenary. Id., 805.

We also note that our Supreme Court has not yet opined on whether prevailing on a claim of actual innocence requires a petitioner to prove that the new evidence presented to the habeas court was unknown to the petitioner at the time of the underlying criminal trial. See *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 551 n.8, 22 A.3d 1196 (2011); see also *Bowens* v. *Commissioner of Correction*, 333 Conn. 502, 507, 217 A.3d 609 (2019) (court assumed without deciding issue of whether petitioner's claim of actual innocence was required to be predicated on newly discovered evidence). This court, however, has consistently and repeatedly held that habeas judges are bound by the requirement that the evidence of actual innocence be newly discovered. See *Lopez* v. *Commissioner of Correction*, 208 Conn. App. 515, 556–57, 264 A.3d 1097 (2021) (collecting cases), cert. denied, 340 Conn. 922, 268 A.3d 77, cert. denied sub nom. *Lopez* v. *Quiros*, U.S. , 142 S. Ct. 2730, 212 L. Ed. 2d 790 (2022). Under Connecticut law, as expressed by this court, evidence is new if the petitioner can prove "by a preponderance of the evidence . . . that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Internal quotation marks omitted.) *Ampero* v. *Commissioner of Correction*, 171 Conn. App. 670, 687, 157 A.3d 1192, cert. denied, 327 Conn. 953, 171 A.3d 453 (2017).

With these principles in mind, we first consider whether the habeas court determined that the evidence presented by the petitioner in support of his actual innocence claim was newly discovered.

## A

### Newly Discovered Evidence

To begin our discussion, we note that the habeas court did not make an explicit finding that the fact of Mathis' incapacity was newly discovered evidence.

Such a finding is essential for the petitioner's claims regarding actual innocence. See *Lopez* v. *Commissioner of Correction*, supra, 208 Conn. App. 556–57. The petitioner maintains that the habeas court "does not contest" that the evidence of Mathis' acquittal due to mental disease or defect is newly discovered. The respondent counters that the habeas court did not find that the evidence was newly discovered. The respondent argues that the habeas court merely sustained the respondent's objection regarding habeas counsel's line of questioning as to whether the petitioner's trial attorney knew that Mathis' case would end in an acquittal on the basis of mental disease or defect. After a careful review of the habeas court's memorandum of decision and the record, and despite the absence of an explicit determination that such evidence was newly discovered, we presume for the purposes of resolving this appeal that the court did make this requisite finding. See *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, 320 Conn. 332, 355, 133 A.3d 402 (2016) ("Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The construction of a judgment is a question of law for the court." (Internal quotation marks omitted.)); *Tracey* v. *Miami Beach Assn.*, 216 Conn. App. 379, 395, 288 A.3d 629 (2022) ("a judicial opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding" (internal quotation marks omitted)), cert. denied, 346 Conn. 919, 291 A.3d 1040 (2023).

The petitioner's trial counsel, Smith, testified at the habeas trial that, at the time of the petitioner's trial, he did not know that Mathis' trial would end in a verdict of not guilty by reason of mental disease of defect, although he was aware that Mathis' attorney would make some claim of diminished capacity. He stated that he was not able to speak with Mathis, and Mathis' attorney was not sharing information with him. Smith

also indicated that he believed he would not have had the ability to present evidence of Mathis' lack of intent at the petitioner's trial because it would have required the development of psychiatric evidence that was unavailable when the petitioner's criminal trial commenced, and the ability to develop that evidence was not within his control.

The parties briefly discuss the newly discovered evidence requirement in footnotes in their appellate briefs. The respondent did not argue before the habeas court, nor has he claimed on appeal as an alternative ground for affirmance, that the court did not find that the evidence proffered at the habeas trial was newly discovered. Even so, the record is not without some support for the position that the evidence of Mathis' incapacity could have been ascertained for use in the petitioner's trial. Smith knew Mathis' attorney was going to raise Mathis' competency as a defense at his trial. The petitioner told Thompson that he was aware of Mathis' diagnosis of schizophrenia, and Hightower declared, in his statement, that Mathis was "slow" and "[y]ou can tell he is not right in the head as soon as you meet him" and he was "not a guy I would commit a crime with."

Noticeably absent from the evidence at the habeas trial, however, is any indication that the petitioner's trial counsel would have been successful had he sought a psychiatric evaluation of Mathis prior to the petitioner's trial. Smith testified that he assumed this was not possible and the respondent presented no evidence or argument at the habeas trial to dispute that assumption. Moreover, in closing argument, the respondent's counsel did not argue that the petitioner's evidence was not newly discovered.

In *United States* v. *Brodwin*, 292 F. Supp. 2d 484 (S.D.N.Y. 2003), the United States District Court for the Southern District of New York addressed the issue of

newly discovered evidence in a case involving two defendants, licensed pharmacists, who moved for a new trial after they were convicted of conspiring with a codefendant physician, Ronald A. Jones, to illegally distribute the drug Dilaudid. Id., 485–86. Their claim was based on newly discovered evidence that Jones was insane at the time of the alleged conspiracy. Id., 486. The government argued that the court should deny the defendants' motion for a new trial because the evidence of Jones' insanity could have been discovered with reasonable diligence by defense counsel and was, therefore, not new. Id., 492. The government noted that in the months leading up to the defendants' trial, the parties were on notice that Jones might be suffering from some mental defect, yet defense counsel never made any application to the court requesting that Jones be evaluated for his sanity. Id.

In rejecting the government's argument, the court noted that "the evidence that is newly discovered in this case is not Jones's bizarre behavior, which the parties were aware of before trial, but rather the conclusions reached by experts for Jones and for the [g]overnment that Jones was not sane at the time of the offenses charged. Therefore, although the evidence supporting the experts' conclusions was available before trial, it was not apparent that an expert would conclude that Jones was insane at the time of the offenses charged, and, more importantly, the specific evidence, namely the expert opinions, simply did not exist until after the defendants were convicted. . . . The [g]overnment nonetheless argues that the defendants should have requested that Jones be evaluated for his sanity at the time of the offenses, and that by neglecting to do so, the defendants failed to exercise due diligence in discovering Jones's insanity before trial. The defendants cannot be faulted, however, for not pursuing a finding of Jones's legal insanity before trial, because that course

of action would have faced formidable obstacles that would have made the outcome of any such request both highly uncertain and the cause of much delay. The [g]overnment has cited no authority that would have supported the defendants' efforts to secure a psychological evaluation of a co-defendant, and alleged co-conspirator . . . . Any such request or application by the defendants would have been subject to either the consent of Jones or an order of this [c]ourt, neither of which the defendants should reasonably have expected to be forthcoming, given the fact that Jones himself had rights to a fair trial that deserved protection . . . . The uncertainty resulting from the formidable obstacles the defendants would have faced in making an application for a psychiatric evaluation of Jones, along with the substantial delays that would have resulted from simply making the application, place the request outside the ordinary diligence that could be expected of the defendants in putting on their defense." (Citation omitted.) Id., 493–94.

In the present case, the habeas court could reasonably have reached the same conclusion based on the record before us, particularly because Mathis' attorney was not sharing information with the petitioner's trial counsel and the ability to develop evidence regarding Mathis' lack of capacity was not within his control. Thus, although the habeas court's decision does not unambiguously reflect whether it considered Mathis' lack of capacity as newly discovered evidence, the record suggests that the habeas court reasonably could have believed that this was evidence unavailable at the time of the petitioner's trial. Indeed, the habeas court stated during trial that it was "absolutely obvious [trial counsel] could not have known something that didn't happen until months in the future." See *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, supra, 320 Conn. 355. We will not presume error on the part of the habeas

court. Instead, we presume that the court properly considered the merits of the petitioner's claim for appropriate reasons as reflected in the record. See, e.g., *Stevenson* v. *Commissioner of Correction*, 112 Conn. App. 675, 686, 963 A.2d 1077 (court's ruling was entitled to presumption of correctness because appellate courts do not presume error on part of trial court), cert. denied, 291 Conn. 904, 967 A.2d 1221 (2009). It therefore was the respondent's burden to demonstrate that, in failing to explicitly find that the evidence of Mathis' insanity was newly discovered, the habeas court committed reversible error. The respondent did not formally raise any such claim during the habeas trial or in this appeal. See *State* v. *James K.*, 209 Conn. App. 441, 465, 267 A.3d 858 (2021), aff'd, 347 Conn. 648, 299 A.3d 243 (2023).

Accordingly, for the purposes of our analysis, we will presume that the habeas court did consider the evidence of Mathis' acquittal as newly discovered and unavailable even with the exercise of due diligence by the petitioner and his counsel, particularly because the habeas court addressed, in full, the merits of the petitioner's actual innocence claim. Had the habeas court concluded that the evidence was not newly discovered, it would have ended its discussion there. See generally *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, supra, 320 Conn. 355.

B

Standard for Proving Actual Innocence

We next consider whether the habeas court applied the proper standard in its evaluation of the petitioner's actual innocence claim. "The question of whether the habeas court applied the correct standard is a question of law subject to plenary review." *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 557.

In its memorandum of decision, the habeas court recited the proper "standard for a claim for habeas

relief based on actual innocence" as set forth by our Supreme Court in *Miller* and ultimately concluded that "the petitioner has failed to meet his burden of proving actual innocence." To reach that conclusion, however, the court departed from the standard it recited and relied, instead, on legal authority that we find inapplicable to the analysis. Specifically, the court based its conclusion on the law pertaining to direct appeals by defendants who have sought to overturn their conspiracy convictions because a codefendant has been acquitted of conspiracy in a separate trial. The principal case on which the habeas court relied is *State* v. *Colon*, supra, 257 Conn. 587, in which our Supreme Court upheld the conviction of a defendant as a conspirator despite the acquittal of his sole alleged coconspirator in a separate trial because there was sufficient evidence introduced during the defendant's trial to prove, beyond a reasonable doubt, that the defendant was guilty of conspiracy. *Colon* and the other cases cited therein are not habeas corpus cases, however, and the reviewing courts considered and contrasted the separate, independent evidence of an agreement to commit the crime in question as presented to different juries in two separate criminal proceedings, relying on an analysis that permits the acceptance of inconsistent verdicts. Id., 599.

"In separate trials, [t]he evidence presented to the juries and the manner in which that evidence is presented may be significantly different and certainly will never be identical. . . . As a result, [d]ifferent juries may rationally come to different conclusions, especially when differing evidence is presented." (Citation omitted; internal quotation marks omitted.) Id., 602. *Colon* overruled *State* v. *Robinson*, 213 Conn. 243, 567 A.2d 1173 (1989), in which our Supreme Court previously had concluded that an acquittal, at a separate trial, of the defendant's alleged coconspirator foreclosed prosecution of the defendant for conspiracy because the culpability of the coconspirator was "an essential element

of the defendant's offense." (Internal quotation marks omitted.) *State* v. *Colon*, supra, 257 Conn. 598; see also id., 603. In deciding *Robinson*, the Supreme Court relied on its prior decision in *State* v. *Grullon*, 212 Conn. 195, 562 A.2d 481 (1989), in which it reversed the judgment of conviction of the defendant for an alleged conspiracy with a police informant because it deemed the police informant incapable of possessing the requisite criminal intent to form a conspiracy with the defendant. See *State* v. *Robinson*, supra, 250–53. The court in *Grullon* relied on a line of cases that described conspiracy in bilateral terms and held that where two coconspirators were tried together, the acquittal of one and the conviction of the other on the charge of conspiracy is not possible. See *State* v. *Grullon*, supra, 202. It stated that "[u]nder our [conspiracy] statute . . . a defendant cannot be guilty of conspiracy if the only other member of the alleged conspiracy lacks any criminal intent." Id., 199.

In *Colon*, the court specified that the ruling in *Grullon* makes obvious sense in the context of a single trial but that that ruling does not apply where the acquittal of one coconspirator occurs in a separate trial. See *State* v. *Colon*, supra, 257 Conn. 599. It explained that "[i]t has long been recognized that criminal juries in the United States are free to render not guilty verdicts resulting from compromise, confusion, mistake, leniency or other legally and logically irrelevant factors" and concluded that "[t]he acquittal of the defendant's coconspirator did not nullify the defendant's conviction of the same charge, where the two defendants were tried separately, and their respective juries were presented with separate, independent evidence of their agreement to commit the crime in question." (Internal quotation marks omitted.) Id., 603–604.

In reviewing a claim of actual innocence in a habeas petition, however, the habeas court is required to

engage in a combined, rather than a separate and independent, review of all the evidence produced both during the petitioner's criminal trial and his habeas trial. This combination of evidence is the potential totality of the evidence that would be presented to a jury if a new trial were to be conducted. The relevant questions that must both be answered in the affirmative for the petitioner to prevail are whether the combined evidence clearly and convincingly establishes the petitioner's actual innocence and whether no reasonable fact finder could find the petitioner guilty beyond a reasonable doubt when confronted with the evidence available at the original criminal trial, together with the newly discovered evidence presented during the habeas trial. See *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 791–92; see also *Charlton* v. *Commissioner of Correction*, 51 Conn. App. 87, 89–91, 719 A.2d 1205 (1998), cert. denied, 247 Conn. 961, 723 A.2d 815 (1999). We therefore agree with the petitioner that the habeas court's reliance on the fact that the two separate verdicts on the conspiracy charge are inconsistent should not have formed the basis for the habeas court's resolution of this case in favor of the respondent. Although this would be true were the petitioner raising his claim in a direct appeal, the rule in *Colon* is not applicable to the claim of error raised in this habeas appeal.

The habeas court should have considered the evidence presented in both the petitioner's criminal trial and in the habeas trial as if it were a single body of evidence that would be presented at a new trial. Stated differently, it should have determined whether the petitioner had satisfied his burden of proving his actual innocence based on all of the aggregate evidence before it. The court did not do so here. Instead, the habeas court determined that "the factual findings from Mathis' case cannot simply be inserted into the petitioner's trial" and, thus, expressly excluded a significant portion

of the aggregate evidence from its analysis. This was improper. By failing to consider the transcripts from Mathis' trial, which had been submitted as exhibits at the habeas trial, the habeas court eschewed the standard it was required to apply. Even so, as we discuss in the following section, we conclude, on the basis of our "independent and scrupulous examination of the entire record" and our plenary review, that the ultimate conclusion reached by the habeas court, that the petitioner failed to meet his burden of proving his actual innocence, is correct. See *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 803.

C

Evidence of a Conspiracy to Commit
Robbery in the First Degree

As noted previously, the petitioner claims that because his codefendant, Mathis, subsequently was found not guilty by reason of mental disease or defect, Mathis lacked the requisite mens rea to enter into a conspiracy with the petitioner or to commit robbery. Moreover, the petitioner argues that Mathis' inability to form an intent to agree to commit any crime at the time also disproves that he committed every one of the three crimes of which the petitioner was convicted—felony murder, conspiracy to commit robbery in the first degree and robbery in the first degree. The respondent maintains that the petitioner's actual innocence claim is unavailing because he failed (1) to establish that no reasonable fact finder would have found him guilty on the basis of the evidence presented at his criminal and habeas trials and the reasonable inferences drawn therefrom, and (2) to produce affirmative proof that he did not commit the crimes of which he stands convicted. In other words, the respondent argues that the petitioner failed to meet his burden of proving his actual

innocence. We agree with the respondent, although we arrive at this conclusion by way of a different path.

General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ." It is well settled that "conspiracy requires a showing that two or more coconspirators intended to engage in or cause conduct that constitutes a crime. Under our statute, therefore, a defendant cannot be guilty of conspiracy if the only other member of the alleged conspiracy lacks any criminal intent." *State* v. *Grullon,* supra, 212 Conn. 199.

As we have noted, to satisfy the *Miller* standard for habeas relief based on actual innocence, the petitioner was first required to establish by clear and convincing evidence that he was actually innocent of the crimes of which he was convicted. "[T]he clear and convincing evidence standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory. . . . [T]he clear and convincing burden [is] an extraordinarily high and truly persuasive [demonstration] of actual innocence . . . one in which the petitioner must unquestionably establish [his] innocence. . . . [T]ruly persuasive demonstrations of actual innocence after conviction in a fair trial have been, and are likely to remain, extremely rare. . . . Actual innocence, also referred to as factual innocence . . . is different than legal innocence. Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt." (Citations omitted; internal quotations marks omitted.) *Gould* v. *Commissioner of Correction,* supra, 301 Conn. 560–61.

"Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime." Id., 561. "Affirmative proof of actual innocence is that which might tend to establish that the petitioner *could not* have committed the crime even though it is unknown who committed the crime, that a *third party* committed the crime or that *no* crime actually occurred."[9] (Emphasis in original.) Id., 563. "Clear and convincing proof of actual innocence does not, however, require the petitioner to establish that his or her guilt is a factual impossibility." Id., 564.

The petitioner argues that the newly discovered evidence of Mathis' acquittal is sufficient to satisfy his burden of proving actual innocence of all three of the crimes of which he was convicted because the lack of a willing agreement between him and Mathis establishes that no crimes were actually committed. The respondent argues that the petitioner's contention that the state could not satisfy the element of intent as to the crimes of which the petitioner was convicted based on Mathis' subsequent acquittal overlooks the substantial body of evidence adduced at the petitioner's criminal and habeas trials. This argument, however, derives from the respondent's reliance on *State* v. *Colon*, supra, 257 Conn. 587, which, as we have explained, is not applicable to a claim of actual innocence raised in a habeas petition. As such, like the habeas court, the respondent relies on an improper standard in his review of the evidence adduced at the criminal trial and the habeas trial, viewing the evidence from each as separate and independent, rather than as an aggregate body of evidence, as required by *Miller*.

---

[9] We note that the habeas court predicated its conclusion on its finding that the petitioner had not satisfied this prong of the *Miller* standard. Specifically, it found that "the verdict in Mathis' case does not meet the burden that the petitioner must establish 'by clear and convincing evidence' that he '*could not* have committed the crime, that a *third party* committed the crime, or that *no* crime actually occurred.' " (Emphasis in original.)

Our review of the transcripts from Mathis' criminal trial, which were admitted as evidence in the habeas trial, displays a virtually uncontested proceeding wherein the prosecutor did not dispute the fact that Mathis, a seriously ill schizophrenic at the time of the incident, was incapable of forming any intent to commit the crimes of which he was charged, including conspiracy, and was, therefore, not guilty of those crimes by reason of mental disease or defect pursuant to § 53a-13. On May 24 and 25, 2017, the case against Mathis was tried to the court in two phases. Mathis was charged with three crimes: reckless manslaughter in the first degree with a firearm, robbery in the first degree and conspiracy to commit robbery in the first degree. He had raised the § 53a-13 affirmative defense and claimed that, on the day of the homicide, he lacked the capacity to form an intent to commit the crimes with which he was charged due to mental disease or defect. The prosecutor presented evidence of Mathis' involvement in these crimes and the resulting death of the victim through a single witness, Reeder, the lead investigator in the homicide case, whom the defense did not cross-examine. Also introduced without objection were statements from Thompson, Hightower and Therrien, which had been admitted in the petitioner's criminal trial.[10]

The statement of Thompson, which Reeder read to the jury during the petitioner's criminal trial, indicated that he and the petitioner were supposed to rob the victim together and that the petitioner actively involved Mathis on the day the robbery occurred because Thompson was not available. Both Mathis and Thompson had been present on one occasion before the homicide when the petitioner phoned the victim about purchasing the tablets advertised on Craigslist. On May 25,

---

[10] During the petitioner's criminal trial, Thompson's and Hightower's statements were admitted for substantive purposes as prior inconsistent statements under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). See also *State* v. *Moon*, supra, 192 Conn. App. 91 n.10.

2017, after hearing the state's evidence, the court found that the state had proven all of the elements of the three crimes with which Mathis was charged.

Thereafter, during the second phase of the trial, the defense called Peter Morgan, Chair of Psychiatry at Lawrence + Memorial Hospital, to testify. Morgan had prepared a report subsequent to his evaluation of Mathis, which began in May, 2015, and ended in January, 2017, the month after the petitioner's criminal trial concluded.[11] He testified that, in his opinion, to a reasonable degree of medical certainty, Mathis suffered from schizophrenia, paranoid type, and that around the time of the homicide he was suffering from severe symptoms of that illness, having been released from an inpatient hospitalization at the Institute of Living just six days before the date of the homicide. Morgan opined that Mathis lacked the capacity to understand the wrongfulness of his actions and could not conform his behavior to the law at the time of the incident. The state did not offer opposing expert testimony and indicated to the court that it did not contest that Mathis had established his § 53a-13 affirmative defense by way of the evidence presented through Morgan. Indeed, the state even established during its cross-examination of Morgan that the reliability of his evaluation was strengthened by the fact that there were medical records that confirmed Mathis' active symptoms at or around the time of the homicide. The court found that Mathis had proven his affirmative defense and referred him to the Department of Mental Health and Addiction Services for an evaluation to be followed by a hearing in accordance with General Statutes §17a-582.[12]

---

[11] Morgan's report and the date of its preparation are not part of the record, but it most likely was prepared after the petitioner's criminal trial concluded in December, 2016.

[12] General Statutes § 17a-582 provides in relevant part: "(a) When any person charged with an offense is found not guilty by reason of mental disease or defect pursuant to section 53a-13, the court shall order such acquittee committed to the custody of the Commissioner of Mental Health

On July 24, 2017, after reviewing the written evaluation and testimony of Rina Kapoor, Chief of Forensic Services at Whiting Forensic Division, Connecticut Valley Hospital, the court committed Mathis to the Whiting Forensic Division of Connecticut Valley Hospital, under the jurisdiction of the Psychiatric Security Review Board, for a maximum period of eighty years.

There is no question, given the cooperative manner in which the trial of Mathis was conducted, including the presentation of his affirmative defense, that Mathis' acquittal establishes, by clear and convincing evidence, that he was unable to form any intent to conspire with the petitioner to rob the victim. In light of the holding in *Grullon*, if this newly discovered evidence regarding Mathis' trial and his not guilty verdict were to be introduced in a new trial of the petitioner regarding his criminal charges, a properly instructed jury could reasonably reach one conclusion, namely, that the petitioner was actually innocent of conspiring with Mathis

and Addiction Services who shall cause such acquittee to be confined, pending an order of the court pursuant to subsection (e) of this section, in any of the state hospitals for psychiatric disabilities or to the custody of the Commissioner of Developmental Services, for an examination to determine his mental condition.

"(b) Not later than sixty days after the order of commitment pursuant to subsection (a) of this section, the superintendent of such hospital or the Commissioner of Developmental Services shall cause the acquittee to be examined and file a report of the examination with the court, and shall send a copy thereof to the state's attorney and counsel for the acquittee, setting forth the superintendent's or said commissioner's findings and conclusions as to whether the acquittee is a person who should be discharged. . . .

"(e) At the hearing, the court shall make a finding as to the mental condition of the acquittee and, considering that its primary concerns are the protection of society and the safety and well-being of the acquittee, make one of the following orders:

(1) If the court finds that the acquittee is a person who should be confined or conditionally released, the court shall order the acquittee committed to the jurisdiction of the board and either confined in a hospital for psychiatric disabilities or placed with the Commissioner of Developmental Services, for custody, care and treatment pending a hearing before the board pursuant to section 17a-583; provided (A) the court shall fix a maximum term of

to commit robbery in the first degree. See *State* v. *Grullon*, supra, 212 Conn. 199. Stated simply, no crime of conspiracy could have been committed because Mathis was incapable of agreeing with the petitioner to commit robbery. See *State* v. *Montgomery*, 22 Conn. App. 340, 344, 578 A.2d 130 ("[t]he concept of a conspiracy of one can be likened to the sound of one hand clapping—it is an impossibility"), cert. denied, 216 Conn. 813, 580 A.2d 64 (1990). Without proof of another coconspirator besides Mathis, the defendant's conviction of conspiracy to commit robbery in the first degree could not stand.

Relying on *Ankerman* v. *Commissioner of Correction*, 122 Conn. App. 246, 999 A.2d 789, cert. denied, 298 Conn. 922, 4 A.3d 1225 (2010), in which this court held that the petitioner's claim that the state failed to prove the specific intent element "[was] essentially one of sufficiency of the evidence and not one of actual innocence"; id., 252; the respondent argues that the petitioner's reliance on evidence regarding Mathis' inability to engage with the petitioner in a conspiracy to commit robbery "fails because . . . it hinges on *legal* innocence, i.e., whether the state presented sufficient evidence to prove the essential elements of the crimes beyond a reasonable doubt, as opposed to *actual* innocence, i.e., whether the petitioner actually engaged in the criminal conduct at issue—the planning and execution of the robbery." (Emphasis in original.) We disagree. If two persons do not both intend to conspire, no conspiracy is committed. See *State* v. *Grullon*, supra, 212 Conn. 199; see also *State* v. *Green*, 261 Conn. 653, 670–73, 804 A.2d 810 (2002) (reaffirming that conviction for conspiracy cannot be sustained in case in which same jury convicts one alleged conspirator of conspiracy to commit offense and acquits other). In other

commitment, not to exceed the maximum sentence that could have been imposed if the acquittee had been convicted of the offense . . . . "

words, no crime actually occurs, which, by definition, is affirmative proof of actual innocence. See *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 560–61; see also C. Leonetti, "The Innocence Checklist," 58 Am. Crim. L. Rev. 97, 106 (2021) (explaining that actual innocence means that "the defendant did not commit the crime"). "Legal innocence," however, as the respondent recognizes, means that "there [is] insufficient evidence to prove guilt beyond a reasonable doubt."[13] Id.; see also N. Berg, "Turning a Blind Eye to Innocence: The Legacy of *Herrera* v. *Collins*," 42 Am. Crim. L. Rev. 121, 122 (2005) ("In the criminal context, legal innocence means that not enough proof of guilt was introduced at trial to establish that a defendant is guilty beyond a reasonable doubt. In contrast, actual innocence means simply that the defendant did not commit the offense in question.").

In this case, Mathis' inability to conspire with the petitioner is newly discovered evidence that is more than sufficient to prove that the petitioner could not have committed with Mathis alone the crime of conspiracy to commit robbery. We therefore conclude that the evidence from the Mathis trial, if introduced in the context of a single trial of the petitioner, would give rise to a finding of actual innocence, not legal innocence, as defined in *Miller*. The undisputed fact that Mathis

---

[13] The respondent predicates his argument on this definition of "legal innocence." We do note, however, that "legal innocence" can result for reasons that do not substantively address a defendant's guilt, such as where a victim refuses to testify or where evidence of guilt is suppressed for procedural or constitutional reasons. See *Shaw* v. *Dept. of Administration*, 861 P.2d 566, 570 n.3 (Alaska 1993); L. Litman, "Legal Innocence and Federal Habeas," 104 Va. L. Rev. 417, 437 (2018); 3 R. Mallen, Legal Malpractice (2024 Ed.) § 27:42. Indeed, "one can be legally innocent but not actually innocent due to a statute that is held to be unconstitutional, or due to ineffective assistance of counsel." (Footnote omitted.) R. Wilson, "From Advocate to Party—Defenses for Lawyers Who Find Themselves in Litigation," 61 S. Tex. L. Rev. 43, 73 (2020). None of these scenarios, including the one upon which the respondent relies, are implicated here.

suffered from a mental illness that rendered him unable to form the intent to conspire means that no crime of conspiracy involving solely Mathis as coconspirator actually could have occurred. See *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 747. As such, the aggregate evidence that would be presented in the context of a single trial establishes that no conspiracy could exist between the petitioner and Mathis. See *State* v. *Montgomery*, supra, 22 Conn. App. 344.

There is, however, in the same evidentiary aggregate, proof of the petitioner's conspiring to commit the same robbery with a person other than Mathis: namely, Thompson.[14] During the petitioner's criminal trial, when Thompson was called to the stand, he initially refused to testify and attempted to exercise his fifth amendment

---

[14] Following oral argument in this appeal, this court ordered the parties to file simultaneous supplemental memoranda "addressing whether the petitioner's claim of actual innocence is negated if the record discloses that he also conspired with [Thompson] to rob the victim." The parties complied with our supplemental memoranda order, and we have considered their arguments in our resolution of the appeal. The respondent argues that because "[t]he record affirmatively shows . . . that the petitioner . . . conspired with [Thompson] to rob the victim" the petitioner's actual innocence claim must fail. The petitioner disagrees with the respondent and argues that our "inquiry is flawed from its inception" because it is "beyond [our] purview to determine whether [the petitioner] was guilty of conspiring with Thompson . . . ." Even so, he acknowledges that the "state presented evidence to support its assertion that [Thompson] and [the petitioner] conspired to perpetuate a robbery," and he recites "[t]he proper standard for evaluating a freestanding claim of actual innocence" in a habeas proceeding. (Internal quotation marks omitted.) The petitioner does not, however, reconcile his argument against our considering the evidence of his conspiring with Thompson with that proper standard and our obligation (1) to conduct an "independent and scrupulous review of the entire record" to determine whether the evidence from both the original criminal trial and the habeas corpus trial clearly and convincingly establishes that he is actually innocent of the crime of conspiracy to commit robbery and (2) to determine whether, on the basis of the totality of all of the evidence from both proceedings, and inferences drawn therefrom, no reasonable fact finder would find him guilty of that crime. He focuses, instead, on standards that have no bearing on our analysis of his claim of actual innocence.

right against self-incrimination.[15] He claimed that the statement he had given to the police had been coerced, stating "the shooting task force told me if I didn't sign that statement they was going to charge me with conspiracy to that homicide because I had knowledge of it, that's the only reason why I signed it." After being allowed to consult with a court-appointed public defender regarding his fifth amendment claim, however, he did testify, and his testimony was inconsistent with the written statement he previously had given to the police. In other words, Thompson's testimony challenged the accuracy of his prior written statement. As such, the state moved to admit as a full exhibit Thompson's written statement. After the court found the statement reliable and allowed its admission, the state recalled Reeder, who read the statement to the jury. See footnote 10 of this opinion.

Thompson's statement reveals that the petitioner conspired with him to rob the victim.[16] It provides in relevant part:

"I, Jahvon Thompson, and having Detective Reeder type this statement for me, I have not been threatened or promised anything for giving this statement. I am not under the influence of drugs or alcohol. I've been

---

[15] The record reflects that Thompson acknowledged having committed felony larceny for which he received probation and that he had been arrested in 2014 for violation of that probation, firearms charges and domestic assault. Moreover, at the time of trial, there was a pending robbery charge against him.

[16] We note that, in responding to the petitioner's actual innocence claim in both the habeas proceedings and in this appeal, the respondent focuses solely on Mathis as the petitioner's coconspirator and argues that Mathis' acquittal has no bearing on the petitioner's conviction of the crime of conspiracy to commit robbery. As stated herein, that argument fails because it is predicated on the rule in *Colon*, which is inapplicable. Even so, the scope of our review of the habeas court's conclusion as to the petitioner's actual innocence claim requires us to conduct an independent and scrupulous examination of *all* of the evidence produced during the petitioner's criminal and habeas trials, and this includes Thompson's statement.

advised of my *Miranda* rights, and I have agreed to speak with the police. I understand that I am under arrest for the guns, weed, and domestic incident at my house this morning.

"I have information about a homicide that happened on Allendale in Hartford about a year ago. It was in May of 2013.

"I am friends with [the petitioner]. His nickname is Mook. He lives on Catherine Street, right by the cut from Allendale where the [victim] was killed. He lives on the second floor. I have known [the petitioner] for about four to five years. [The petitioner] is about twenty-two years old. . . .

"The [victim] was trying to sell two tablets on [Craigslist]. [The petitioner] and I had planned to rob this guy. A day or two before the [victim] got killed on Allendale, [the petitioner], Fetti[17] and I were together. [The petitioner] had Fetti's cell phone and was texting the guy selling the tablets. . . . He was selling two of them. [The petitioner] used Fetti's phone to talk with the guy selling the tablets. You should be able to find the text on Fetti's phone.

"Something came up and I had to go so we did not rob [the victim] that day. [The petitioner] and I were broke so that is why we wanted to rob [the victim]. . . . I think the day after [the victim] got killed, [the petitioner] called me and told me to come over. [The petitioner] was whispering on [the] phone and I thought he was in trouble and that he was running from someone.

"I went over to . . . [the petitioner's] house on Catherine Street. . . . I picked up [the petitioner] at his

---

[17] Evidence at the petitioner's criminal trial established that Mathis' nickname was Fetti.

house. It was just [the petitioner] and me in the car. We were driving around.

"[The petitioner] looked and sounded really scared. [The petitioner] was saying, the dumb [Mathis] killed him. He was saying this over and over again. [The petitioner] told me that Fetti had shot and killed the guy me and [the petitioner] had planned to rob. [The petitioner] said he had used Fetti's phone to get in [touch] with the guy on [Craigslist]. [The petitioner] told me he had told [the victim] to meet on Allendale by the cut so he could run back to his house after they rob him.

"[The petitioner] told me he gave Fetti his gun. I had seen [the petitioner] with this gun before. It is a revolver, a little .22 or maybe a .25. [The petitioner] told me he had grabbed one of the tablets and that Fetti went to the driver's door with the gun. [The petitioner] told me that he went to the passenger's side of the car and grabbed one tablet from [the victim]. There was supposed to be two tablets. [The petitioner] said Fetti was standing next to the driver door with the gun and just shot the [victim]." (Footnote added.)

After reading Thompson's statement into the record, Reeder confirmed that Thompson had provided him with information that he actually was going to participate in the robbery with the petitioner and testified that he never threatened Thompson with being arrested as a conspirator for the incident. Moreover, Reeder had previously testified that Mathis' phone was used to call the victim the morning of Friday, May 3, 2013. This corroborated Thompson's statement that he, the petitioner and Mathis were all present when the petitioner first contacted the victim about his Craigslist advertisement regarding the two tablets. Later that same day, Mathis' phone was used to call Thompson's phone.

The evidence that Thompson also planned the robbery with the petitioner was not completely discounted

during the criminal trial. The information in the petitioner's criminal trial charged that the petitioner had conspired with "another person" to commit robbery in the first degree. The prosecutor argued to the jury that Thompson's statement alone established all of the elements of all of the charges against the petitioner and that Thompson was the first one enlisted by the petitioner to commit the robbery.

The court instructed the jury that it could find the petitioner guilty of conspiracy to commit robbery in the first degree if it found beyond a reasonable doubt that, "one . . . the [petitioner] had the intent [that] conduct constituting the crime of robbery in the first degree be performed, and two, that, acting with that intent he agreed with one or more persons to engage in that conduct or cause that conduct to be performed, robbery in the first degree, and three, that either he or any one of the other parties to the agreement committed an overt act [to further the purpose of] the conspiracy." No exception to this instruction, which charged the jury to consider a conspiracy involving the petitioner and one *or more* persons, was taken by either the state or the petitioner.

We conclude that this aggregate evidence, if presented in a new trial, would not prevent a reasonable jury from finding, beyond a reasonable doubt, that the petitioner was guilty of a conspiracy, despite the evidence of Mathis' lack of mental capacity at the time of the homicide. There is substantial evidence within this aggregate that the petitioner conspired with Thompson to commit the robbery.[18] See General Statutes § 53a-48.

_____

[18] In fact, the evidence in the record indicates that the petitioner contacted Thompson after the homicide to enlist his assistance in driving him to Mathis' home so the petitioner could ensure that Mathis would not say anything inculpatory to the police. From that evidence, the trier of fact reasonably could infer that the petitioner did so because Thompson was already involved in the crime, and not a person with no prior involvement and nothing to lose if damaging information were to be disclosed to the police.

As such, even if evidence of Mathis' incapacity had been presented at the petitioner's criminal trial, there was still sufficient evidence from which the jury could find the petitioner guilty of conspiracy to commit robbery. On the basis of Thompson's *Whelan* statement and Reeder's testimony, the jury reasonably could have found that Thompson was a willing coconspirator. Indeed, the petitioner first planned to rob the victim with Thompson, and Thompson testified, and the jury could have believed, that the police, in an effort to obtain his cooperation, told him that he might be charged as a conspirator. The fact that Thompson was never charged as a coconspirator is of no significance to our analysis. "Conspirators need not all be charged in order to sustain a conviction of one of them for conspiracy." *State* v. *Shaw*, 24 Conn. App. 493, 494 n.1, 589 A.2d 880 (1991); see also *State* v. *Asberry*, 81 Conn. App. 44, 56 n.7, 837 A.2d 885, cert. denied, 268 Conn. 904, 845 A.2d 408 (2004) (same); *Crump* v. *Commissioner of Correction*, 68 Conn. App. 334, 338, 791 A.2d 628 (2002) (same).

On the basis of our independent and scrupulous review of the entire record of this case, we conclude that the habeas court correctly found that the petitioner failed to meet his burden of establishing, by clear and convincing evidence, that he could not have committed the crime of conspiracy to commit robbery, that a third party committed the crime of conspiracy to commit robbery or that no crime of conspiracy to commit robbery actually occurred.[19] The aggregate evidence simply does not unquestionably establish the petitioner's innocence of that crime. See *Miller* v. *Commissioner of*

---

[19] We acknowledge that our rationale underlying this conclusion differs from that of the trial court. "[I]t is axiomatic that [an appellate court] may affirm a proper result of the trial court for a different reason." (Internal quotation marks omitted.) *Tracey* v. *Miami Beach Assn.*, supra, 216 Conn. App. 396 n.18.

*Correction*, supra, 242 Conn. 795 ("the clear and convincing evidence standard . . . forbids relief whenever the evidence is loose, equivocal or contradictory" (internal quotation marks omitted)). Furthermore, we conclude upon plenary review that a reasonable fact finder, if presented with the aggregate evidence, could find the petitioner guilty of conspiracy to commit robbery in the first degree. See id., 807.

D

Evidence of Robbery in the First
Degree and Felony Murder

We next address the petitioner's claim that he is actually innocent of robbery in the first degree and felony murder because Mathis' mental state prevented him from forming any intent to participate in the robbery, which is the predicate felony for the felony murder charge. We disagree.

Our analysis of this claim is informed by this court's opinion in *State* v. *Moon*, supra, 192 Conn. App. 74–83. In his direct appeal, the first issue the petitioner raised was that the court improperly instructed the jurors for the first time, during deliberations in response to a question they posed, that the petitioner "could be convicted of robbery even if another person was the one to use force . . . ." Id., 74.

In addressing this issue, this court stated: "Count two of the information charging the [petitioner] [with robbery in the first degree pursuant to § 53a-134 (a) (2)] alleged: '[O]n or about May 8, 2013 at 8:00 p.m. on Allendale Road in Hartford . . . while in the course of the commission of a robbery and in immediate flight therefrom, [the petitioner] or another participant in the crime was armed with a deadly weapon.'

"During closing argument, the state argued that the [petitioner] was one of the two participants in the robbery and that it was legally irrelevant whether he or Mathis shot the victim. . . .

"Under the heading 'conclusion,' the court [initially] provided: 'In summary, the state must prove beyond a reasonable doubt the following elements of robbery in the first degree: (1) the [petitioner] was committing a larceny; and (2) that *he* used physical force or threatened the use of physical force for the purpose of preventing or overcoming resistance to the taking of property or to the retention of property immediately after the taking or compelling the owner of the property or another person to deliver up the property or to engage in other conduct that aids in the commission of larceny; and (3) that in the course of the commission of the robbery or immediate flight from the crime, the [petitioner] or another participant in the crime was armed with a deadly weapon.' . . .

"The court provided the jurors with a paper copy of the jury instructions for their use during deliberations. During deliberations, the jury sent the court the following note: 'Does "the use or threat of use of physical force" element of robbery in the first degree require a finding that the [petitioner] personally used or threatened the use of force or is it sufficient as to the "use or threat of use of physical force" element if, in the course of the larceny, force was threatened by any party to the larceny? . . .

"Upon receiving the note from the jury, the court discussed the matter with counsel. Although the court stated that it believed that the instruction on robbery in the first degree was proper, it nonetheless proposed responding to the jury's note by adding the phrase 'another participant' to the use of force instruction . . . . The court explained that it was its belief that

the addition of this language would clarify that the jury could find the [petitioner] guilty of robbery in the first degree if he *or another participant in the crime* used or threatened the use of physical force.

"Defense counsel objected, stating that the proposed clarification would serve as an 'unfair invasion of the province of the jury' and improperly introduce the concept of accomplice liability. . . . Over the [petitioner's] objection, the court decided to provide the jury with its proposed clarification." (Emphasis added.) Id., 75–78.

In concluding that the trial court properly instructed the jury regarding robbery in the first degree, this court held that "[t]he plain language of [§ 53a-134 (a)] states that an individual may be guilty of robbery in the first degree if he or another participant in the crime uses or threatens the use of a dangerous instrument. In *State* v. *Davis*, [255 Conn. 782, 791 n.8, 772 A.2d 559 (2001)], our Supreme Court concluded that § 53a-134 applies to both principals and accessories, stating: [O]ur robbery statute, § 53a-134, includes explicit accessory language within the text of the statute. . . . Because the robbery statute applies to principals *and* accessories on its face, the court did not need to explain the concept of accessorial liability to the jury as it relates to the robbery charge. . . . Our Supreme Court also noted that our law makes no practical distinction between the terms accessory and principal for the purposes of determining criminal liability." (Emphasis in original; internal quotation marks omitted.) *State* v. *Moon*, supra, 192 Conn. App. 81.

Accordingly, although the petitioner was not charged as an accomplice, the evidence was sufficient to convict the petitioner of robbery despite the lack of any instruction on accomplice liability because there was sufficient evidence for the jury to find that during the commission of the robbery, the petitioner acted in concert with

Mathis. See *State* v. *Latorre*, 51 Conn. App. 541, 552, 723 A.2d 1166 (1999).

Moreover, Mathis' legal incapacity as a participant in the commission of the robbery would not afford the petitioner any defense at trial and thus does not support his actual innocence claim on this charge. The petitioner has never disputed that Mathis shot and killed the victim. He contended that, although he was present at the scene of the robbery, he was a distance away and had no intent to commit the robbery. The state, however, alleged that the petitioner worked in concert with Mathis and that both of them committed the robbery, and the jury found the petitioner guilty of that crime.

During the Mathis trial, the state took the position that Mathis shot and killed the victim and charged him with manslaughter in the first degree with a firearm under the reckless subsection of the statute. From the aggregate evidence presented during the habeas trial, the petitioner is clearly portrayed as an alleged accomplice to the principal, Mathis, who used physical force during the robbery that resulted in the victim's death.

General Statutes § 53a-9 provides in relevant part: "In any prosecution for an offense in which the criminal liability of the defendant is based upon the conduct of another person under section 53a-8[20] it shall not be a defense that: (1) Such other person is not guilty of the offense in question because of lack of criminal responsibility or legal capacity or awareness of the criminal nature of the conduct in question . . . or because of

[20] General Statutes § 53a-8 provides in relevant part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ." This statute establishes the guilt of an accused as an accessory.

other factors precluding the mental state required for the commission of the offense in question; or (2) such other person has not been prosecuted for or convicted of any offense based upon the conduct in question, or has been acquitted thereof . . . ." (Footnote added.)

In *State* v. *McCarthy*, 179 Conn. 1, 425 A.2d 924 (1979), the defendant was found guilty of murder and attempt to commit murder. Id., 2. In the indictment, information and bill of particulars, he was charged under § 53a-8. Id., 13–14. "[T]he state alleged that the defendant 'did intentionally aid one Jean Siretz, while the latter, with intent to cause the death[s] of [Donald and] one Victoria Stuart, did shoot and cause the death of said Victoria Stuart.' Considerable testimony was adduced at the trial that Siretz was so affected by drugs that she was incapable of forming any intent. . . . In its charge, the court instructed the jury that [§ 53a-9] governed the situation and that 'the mental state or intent of [Siretz] is irrelevant.' He went on to note that: 'You may disregard that word "intent" as far as she is concerned. Her intent is not a necessary element. . . . It is surplusage in the indictment.' " (Footnote omitted.) Id., 14.

Our Supreme Court held that "[t]he purpose behind § 53a-9 is to prevent the specific type of evil presented by this precise fact situation: A Mansonesque[21] figure using a mentally incompetent individual to commit a crime and going free because the actual perpetrator is incapable of the requisite intent. A crime may be performed though the actual perpetrator lacked the requisite mental capacity. . . . It is but to quote the hornbook to say that in every crime there must exist

---

[21] The court was referring to the notorious criminal defendant, Charles Manson, in *People* v. *Manson*, 71 Cal. App. 3d 1, 139 Cal. Rptr. 275 (1977), cert. denied, 435 U.S. 953, 98 S. Ct. 1582, 55 L. Ed. 2d 803 (1978), and *People* v. *Manson*, 61 Cal. App. 3d 102, 132 Cal. Rptr. 265 (1976), cert. denied, 430 U.S. 986, 97 S. Ct. 1686, 52 L. Ed. 2d 382 (1977). See *State* v. *McCarthy*, supra, 179 Conn. 16.

a union or joint operation of act, or failure to act, and intent. However, this is far from suggesting that the essential element of criminal intent must always reside in the person who does the forbidden act. Indeed, the latter may act without any criminal intent whatever, while the mens rea—willfulness—may reside in a person wholly incapable of committing the forbidden act. The trial court's interpretation and application of § 53a-9 was correct. There was no error in instructing the jury that Siretz' intent was irrelevant." (Citations omitted; footnote altered; internal quotation marks omitted.) Id., 16.

In light of the holding in *State* v. *Davis*, supra, 255 Conn. 782, the prosecutor did not need to specifically charge the petitioner as an accessory in the robbery perpetrated upon the victim, as his criminal liability as an accessory for acts perpetrated by Mathis is inherent in the relevant statute, § 53a-134 (a) (2). It is of no significance that Mathis, the other participant in the robbery who used physical force by firing the gun, lacked the ability to form any criminal intent due to his mental disease or defect. This does not excuse the petitioner from liability.

With respect to the conviction of the petitioner on the charge of felony murder in violation of § 53a-54c, as with the first degree robbery conviction, the petitioner cannot avail himself of the defense that his partner in the robbery, Mathis, could not have formed an intent to kill the victim due to his mental disease or defect. A person is guilty of felony murder when, acting with one or more persons, he commits an underlying felony, such as robbery in the first degree, and in the course of and in furtherance of said underlying felony or in the course of and in furtherance of the defendant's flight therefrom, he or another participant causes the death of a person other than one of the participants. See General Statutes § 53a-54c.

"[T]he phrase in furtherance of was intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact, similar to the concept of proximate cause in the law of torts. Primarily its purpose was to limit the liability of a person whose accomplice in one of the specified felonies has performed the homicidal act to those circumstances which were within the contemplation of the confederates to the undertaking, just as the liability of a principal for the acts of his servant is similarly confined to the scope of the agency. All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Young*, 191 Conn. 636, 642, 469 A.2d 1189 (1983); see also *In re Michael B.*, 36 Conn. App. 364, 375, 650 A.2d 1251 (1994) ("[t]he phrase [in furtherance of] serves to exclude those murders that are committed during the course of an underlying felony but that are wholly unrelated . . . but does not serve to exclude killings that were not intended").

"Nowhere in the [felony murder] statute . . . is there a further requirement of a general intent to commit the homicidal act." *State* v. *Kyles*, 221 Conn. 643, 668, 607 A.2d 355 (1992). The purpose underlying the felony murder statute is "to punish those whose conduct brought about an unintended death in the commission or attempted commission of a felony. . . . The felony murder rule includes accidental, unintended deaths. Indeed, we have noted that crimes against the person like robbery, rape and common-law arson and burglary are, in common experience, *likely to involve danger to life in the event of resistance by the victim*

. . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 667.

It is not necessary for the state to prove beyond a reasonable doubt that the petitioner, or Mathis for that matter, intended that the victim's life be taken. The felony murder statute only requires proof of all of the elements of the underlying felony, in this case, robbery in the first degree, and then proof that one of the participants in the proven robbery, in the course of and in the furtherance of that felony, or in flight from the commission of the felony, caused the death of a nonparticipant victim. Mathis' inability to form an intent to kill the victim is irrelevant. Because the petitioner is criminally liable as a participant in the robbery, and the homicide was committed by the other participant, Mathis, in the execution of that robbery, he is also guilty of felony murder under § 53a-54c. The aggregate evidence presented during the habeas trial is sufficient to prove that the victim was killed in the course of being robbed by the petitioner and Mathis and in furtherance of that crime.

In sum, we conclude that the habeas court's finding that the petitioner failed to meet his burden of proving actual innocence must stand. We have independently and scrupulously examined the entire record of this case and conclude that substantial evidence supports the conclusion that the petitioner is not actually innocent of the crimes for which he stands convicted. Moreover, on our plenary review, we conclude that a reasonable fact finder could find the petitioner guilty beyond a reasonable doubt of the crimes of which he stands convicted when confronted with the evidence available at the original criminal trial, together with the newly discovered evidence presented during the habeas trial.

The habeas court properly denied the petitioner's actual innocence claim.

The judgment is affirmed.

In this opinion the other judges concurred.